Susan Mary Rotkis, AZ Bar No. 032866
**CONSUMER JUSTICE LAW FIRM**
2290 East Speedway Boulevard
Tucson, AZ 85719
T: (602) 807-1504
F: (480) 613-7733
E: srotkis@consumerjustice.com

David A. Chami, AZ Bar No. 027585
**CONSUMER JUSTICE LAW FIRM**
8095 North 85th Way
Scottsdale, AZ 85258
T: (480) 626-2359
F: (480) 613-7733
E: dchami@consumerjustice.com

*Attorneys for Plaintiff*
*Stephanie Stephens & the Putative Class*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Stephanie Stephens; Joelle Nole; William Hilton; and Eugénie Balogun,<br>*individually and on behalf of all others similarly situated,*<br><br>Plaintiffs,<br><br>v.<br><br>American Arbitration Association, Inc.,<br><br>Defendant. | Case No.: 2:25-cv-01650-PHX-JJT<br><br><br>**FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

1

*"Representative government and trial by jury are the heart and lungs of liberty. Without them, we have no other fortification against being ridden like horses, fleeced like sheep, worked like cattle, and fed and clothed like swine and hounds."*
*– John Adams*

## INTRODUCTION

This case is about the predatorial behavior of an arbitration association in its attempt to race to the bottom of the barrel of justice to corner the market on consumer arbitrations. The cost of this injustice to consumers throughout the country cannot be understated. Through practices that include cut-rate pricing on arbitrations that do not adequately reflect the actual cost of neutral proceedings, rules that encourage corporations to provide only one choice in arbitral forums by disallowing discovery into corporations tactics, and shockingly abysmal outcomes for consumers, the American Arbitration Association, Inc. ("AAA") has **obtained over 90% of the consumer arbitration market** and created an illegal monopoly in consumer arbitrations. AAA's monopoly harms competition and consumers by ensuring consumers have no choice in choosing between arbitration forums or even what arbitrator AAA assigns them.

As a result, consumers who have valid claims, retain counsel, and file a claim in the AAA lose 73% of the time nationally and in North Carolina[1] and 89% of the time in West Virginia, for instance. In fact, a consumer would have to be desperate given to their opponents. In all the arbitrations **consumers filed** in West Virginia, consumers have been awarded only $5,915 after final hearings. However, businesses in <u>consumer-filed</u> West Virginia arbitrations have been awarded $60,840 - ten times the amount awarded to consumers.

Consumer arbitration is one of several different areas in which the AAA

---

[1] The national consumer loss rate at the AAA is an identical 73%.

offers arbitration services. The AAA's consumer rules state "These Rules were drafted and designed to be consistent with the minimum due process principles of the Consumer Due Process Protocol." See AAA Consumer Rules p. 1, available at https://www.adr.org/sites/default/files/Consumer-Rules-Web_0.pdf (accessed March 24, 2024). The Consumer Due Process Protocol has fifteen principles and attempts to explain the arbitration process to consumers. See AAA Consumer Due Process Protocol, available at https://www.adr.org/sites/default/files/document_repository/ Consumer%20Due%20Process%20Protocol%20(1).pdf (accessed March 24, 2024). Pursuant to these protocols, arbitration is defined as: "...a process in which parties submit disputes to a neutral third person or persons for a decision on the merits…" *Id* at 7. Principle one is titled "Fundamentally Fair Process" and states that "All parties are entitled to a fundamentally fair ADR process. As embodiments of fundamental fairness, these Principles should be observed in structuring ADR Programs."

The American Arbitration Association now dominates approximately 94% of the private consumer arbitrations in America. The American Arbitration Association is the <u>only</u> forum available to consumers in a staggering 63% of the one hundred twenty-three consumer agreements counsel reviewed prior to filing this complaint.[2] Notably, the AAA is the only forum available to consumers in all five of the top cell phone companies in the United States by subscriber volume,[3] in eight of the nine largest telecoms in West Virginia and North Carolina,[4] in all three of the major credit reporting agencies,[5] and in four of the five most popular

---

[2] See list of credit card contracts starting on page 41 infra.
[3] AT&T, T-Mobile, Verizon, Boost Mobile, and US Cellular.
[4] Spectrum, Frontier, Google Fiber, AT&T Fiber, Verizon Fiber, T-Mobile Home Internet, Optimum, and Starlink.
[5] Equifax, TransUnion, and Experian.

payment apps, such as Zelle, PayPal, and others.[6] This is just the tip of the iceberg.

Through its anticompetitive practices, the American Arbitration Association has created a monopolistic second-tiered justice system that provides consumers with no choice in the forum, the arbitrator, or rules. Instead, there is only one consistent rule: consumers lose 76% of the time in arbitrations they initiate. This is done intentionally through draconian rules, cut-rate arbitrations, and the selection of predominantly corporate defense counsel, as opposed to retired judges, to act as arbitrators. These practices make the American Arbitration Association extremely attractive to businesses who are no doubt thrilled to have a place where, no matter how much consumer litigation is conducted, consumers will be awarded a measly $5,915 amongst all their arbitrations in an entire state.[7] This massive loss rate will only increase if the American Arbitration Association's new proposed consumer rules are implemented, requiring cases with less than $50,000 to be tried on the papers by "desk arbitration." See Exhibit 5, Proposed American Arbitration Association Rules, R. R-36 p. 17. In a forum that does not allow for discovery in any consumer case, the final hearing is often the only place to obtain the facts of the case, and the AAA wants to take that away as well. *Id*.

Throughout this complaint, Plaintiff will compare the American Arbitration Association to JAMS (available at www.jamsadr.com)[8]. JAMS is the second largest forum that accepts consumer arbitrations in the relevant geographic area of the United States of America. However, conflating AAA and JAMS as

---

[6] The CFPB defines General Use Consumer Payment applications on the website here: https://www.consumerfinance.gov/rules-policy/final-rules/defining-larger-participants-of-a-market-for-general-use-digital-consumer-payment-applications/ (accessed March 20, 2025). Plaintiff adopts this definition for the purposes of this complaint.

[7] West Virginia.

[8] The plaintiff is not taking the position that JAMS is a good forum, and instead would argue that none of the arbitral forums that are available in America compared to the state and federal courts in quality and capability.

"competitors" would be misleading. AAA manages an astounding 94% of all consumer arbitrations filed in the United States of America over the previous seven-year period. The other smattering of arbitral forums in the United States accepting consumer arbitrations represented only 5% percent of the 158,733 consumer arbitrations filed in the United States. JAMS, the second largest provider, constitutes 5% of arbitrations, and the only other forum discovered, NAM, constitutes .0003%.

The AAA swallowed the United States consumer arbitration market by charging business cut-rate fees that significantly limit how much arbitrators can charge and earn handling consumer arbitrations through ultra-low hard caps on pay. They also severely restrict the rights of consumers to discover their arbitrations and ensure that the success rate of consumer arbitrations is astronomically low. In West Virginia, only 11% of consumers win their arbitrations at the final hearing in the AAA.

Few arbitrators will spend the time on a complex consumer arbitration to understand it for the meager $2,500 that the AAA capped cases at during most of the class period.[9] What's more, that number dropped to half or $1,250 for settled cases, which is far below the norm for other arbitrations, including the average of $5,572 for JAMS consumer arbitrators that settle before hearing or summary judgment and $27,315.51 for cases after a final hearing. Neutral forums, like JAMS, allow arbitrators to charge their hourly rate. What's more, it is only in consumer arbitrations the AAA caps the arbitrator fees. In all other types of AAA

---

[9] In January of 2024 this year the AAA started allowing a capped fee of $300 per hour instead of the previous per case amount for consumer arbitrations. Consumer arbitrations are the only cases subject this cap, and it is believed to be about half of the average compensation of arbitrators at other forums. See How Much Does Arbitration Coase, ADR Times, available at https://adrtimes.com/how-much-does-arbitration-cost/ (accessed Oct. 29, 2024) ("Currently, surveys show that arbitrators charge between $375 and $1,125 an hour with the midpoint being around $600.")

arbitrations, including Employment, Construction, Corporate, Healthcare, and Labor, the AAA arbitrator is paid his or her hourly rate no matter what it is, the same as JAMS. AAA's "Consumer Rules" are an outlier even within AAA's arbitration business.

The practice of limiting arbitrator fees to $2,500 a day and $1,250 for settled cases discourages experienced and competent legal professionals from joining the AAA consumer case panels. The AAA's current low cap of $300 an hour continues to discourage competent arbitrators from joining the AAA, where the midpoint of arbitrator fees in the country is closer to $600 an hour, and because of AAA's monopolistic power arbitrators at other forums or attorneys who want to become arbitrators would have to lower their rates to approximately half the market rate to be competitive. Further, it discourages arbitrators from reading the pleadings, briefing, researching the law, understating the case, or doing their job. This is the first key to AAA's anticompetitive practice: marketing their arbitration services so far below the market standard that they effectively prevent fair competition. Other forums that offer arbitrators reasonable compensation for reading pleadings, conducting research, and gaining a sufficient understanding of the case are unable to compete.

Not only does this negatively impact consumers, but businesses that want to get a foothold in the door on consumer arbitration services cannot compete with the AAA's anticompetitive pricing and unusually restrictive rules while still maintaining a neutral arbitration service. AAA's anticompetitive pricing and unusually restrictive rules for consumer arbitration discourage entrants from the market and undercut the other forums that have some foothold.

*The two features that the AAA offers corporations are 1) unfairly low prices for arbitrators and 2) an unfair forum where consumers lose. These are the practices the AAA uses to maintain its monopoly, and the balance of this*

*complaint is to illustrate this in more detail.*

## PARTIES

1.    The Plaintiff, Stephanie Stephens, is a resident of Maricopa County, Arizona.

2.    The Plaintiff, William Hilton, is a resident of Putnam County, West Virginia.

3.    The Plaintiff, William Hilton, is a natural person who falls under the protection of Article 6 of the West Virginia Consumer Credit and Protection Act (herein "WVCCPA") and is entitled to the remedies set forth in Article 6 of the WVCCPA.

4.    The Plaintiff, Joelle Nole, is a resident of King County, Washington.

5.    Plaintiff Joelle Nole is a person as defined by RCW 19.86.010(1) of the Revised Code of Washington and is entitled to the consumer protections in RCW 19.86.010 *et seq.*

6.    The Plaintiff, Eugénie Balogun, is a resident of Cumberland County, North Carolina.

1.7.    The Plaintiff, Eugénie Balogun, is a natural person entitled to the consumer protections of the North Carolina General Statutes § 75-1 *et seq.*

2.8.    The Defendant, American Arbitration Association, Inc. (hereinafter AAA)[10], is a corporation with its principal offices in New York and, which does business nationwide.

## QUESTIONS PRESENTED & LIMITATIONS ON CLAIMS

3.9.    The fundamental question presented by this case is not whether arbitration should exist as an institution in consumer cases but whether that game will be rigged to benefit a "non-profit" monopoly. For in a rigged game, Plaintiffs

---

[10] It is worth noting that the AAA is a non-profit organization and receives a tax benefit for its monopolistic services.

are "…fleeced like sheep…" (John Adams, *True Sentiments of America*, 1765.)

4.10.  To be clear, Plaintiffs is are not seeking damages for the conduct of the AAA in the handling or mishandling of any arbitration, including their own. This case is purely about choice. The unfair way the AAA handles consumer arbitrations and their abysmal outcomes for consumers is only presented in this complaint as evidence of both the negative outcome of AAA's monopoly and the second service they provide businesses, i.e., a forum where consumers always lose.

5.11.  Arizona Plaintiff and putative class members areis not asserting any claims, nor are they requesting any damages Plaintiffs may be entitled to, but for the existence of Arizona Code § 12-3001-12-3029.

6.12.  A business, even a "non-profit" one, taking action to create a monopoly is not acting in its capacity as an arbitration forum but merely as a business attempting to corner a market subset, in this case, consumer arbitrations.

## JURISDICTION

7.13.  Jurisdiction is appropriate in this Court pursuant to the federal question arising under 15 USC § 4.

8.14.  Jurisdiction is further proper pursuant to 28 USCS § 1367 as all the state claims are from the same nucleus of operative facts; in fact, the law in all states instructs the Court to look to federal jurisprudence to understand or interpret the state anti-monopoly provisions.

## HISTORY OF MONOPOLY LEGISLATION

9.15.  Section 2 of the Sherman Act, 15 U.S.C. § 2, makes it an offense for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States...."

10.16. While § 1 of the Sherman Act forbids contracts or conspiracies in

restraint of trade or commerce, § 2 addresses the actions of single firms that monopolize or attempt to monopolize, as well as conspiracies and combinations to monopolize.

11.17. The heart of the United States's national economic policy has long been faith in the value of competition. In the Sherman and Clayton Acts, as well as in the Robinson-Patman Act, Congress was dealing with competition, which it sought to protect, and monopoly, which it sought to prevent. *Standard Oil Co. v. Fed. Trade Comm'n*, 340 U.S. 231, 248–49 (1951).

12.18. The Sherman Act condemns predatory pricing when it poses a dangerous possibility of actual monopolization.

13.19. The essence of a claim under either the Sherman or Robinson-Patman statute is the same, namely that a business rival has unfairly priced its products with an objective to eliminate or retard competition and thereby gain and exercise control over prices in the relevant market.

14.20. "'[T]he principal objective of antitrust policy is to maximize consumer welfare by encouraging firms to behave competitively.'" *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 539 (2013).

15.21. "The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality, and the greatest material progress while at the same time providing an environment conducive to the preservation of our democratic political and social institutions." *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 4–5 (1958).

16.22. "But even were that premise open to question, the policy unequivocally laid down by the Act is competition." *Northern Pacific R. Co. v.*

*United States*, 356 U.S. 1, 4–5 (1958).

~~17.~~23. "[A]ntitrust law is concerned with influences that corrupt market conditions, not bargaining power. … Any combination which tampers with price structures is engaged in an unlawful activity." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 773 (2d Cir. 2016).

~~18.~~24. Any anticompetitive act that is unresponsive to consumer preference is perhaps the most significant since "Congress designed the Sherman Act as a 'consumer welfare prescription.'" *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 107 (1984).

~~19.~~25. "…[S]elling below cost, unless mitigated by some acceptable business exigency, was intended to be prohibited by the words 'unreasonably low prices.' That sales below cost without a justifying business reason may come within the proscriptions of the Sherman Act has long been established. Further, when the Clayton Act was enacted in 1914 to strengthen the Sherman Act, Congress passed § 2 to cover price discrimination by large companies which compete by lowering prices, 'oftentimes below the cost of production ... with the intent to destroy and make unprofitable the business of their competitors.' H.R.Rep. No. 627, 63d Cong., 2d Sess. 8.

~~20.~~26. The 1936 enactment of the Robinson-Patman Act was for the purpose of 'strengthening the Clayton Act provisions,' and the Act was aimed at a specific weapon of the monopolist—predatory pricing. Moreover, § 3 was described by Representative Utterback, a House manager of the joint conference committee, as attaching 'criminal penalties in addition to the civil liabilities and remedies already provided by the Clayton Act.' 80 Cong.Rec. 9419." *United States v. National Dairy Products Corp.,* 372 U.S. 29, 33–34 *reh'g denied,* 372 U.S. 961 (1963) (internal citations omitted).

~~21.~~27. Many states have adopted similar statutes to protect marketplace

competition.

22.28. Arizona has made it illegal to establish, maintain, or use a monopoly. A.R.S. § 44-1403.

23.29. The Arizona Constitution, Article 14, Section 15, explicitly prohibits monopolies and trusts, providing:

> Monopolies and trusts shall never be allowed in this state and no incorporated company, co-partnership or association of persons in this state shall directly or indirectly combine or make any contract, with any incorporated company, foreign or domestic, through their stockholders or the trustees or assigns of such stockholders or with any co-partnership or association of persons, or, in any manner whatever, to fix the prices, limit the production, or regulate the transportation of any product or commodity. The legislature shall enact laws for the enforcement of this section by adequate penalties, and in the case of incorporated companies, if necessary for that purpose, may, as a penalty declare a forfeiture of their franchises.

24.30. West Virginia found that "prices below the cost thereof can result in economic maladjustments and tend toward the creation of monopolies, thereby destroying fair and healthy competition; therefore, the below-cost sale of goods with the intent to destroy or the effect of destroying competition is deemed an unlawful unfair trade practice." *W. Va. Code* § 47-11A-1(a).

25.31. The West Virginia Supreme Court of Appeals agreed that the state act "is a rational means of achieving the legitimate legislative goal of promoting healthy competition in this State by penalizing retailers and wholesalers that sell goods below cost in an attempt to destroy competition." Syl. Pt. 2, *Hartsock-Flesher Candy Co. v. Wheeling Wholesale Grocery Co.*, 174 W. Va. 538, 540, 328 S.E.2d 144, 146 (1984).

~~26.~~32. North Carolina has similarly adopted a state act to "promote the vigorous enforcement of the antitrust laws … for Chapter 75 violations will best advance the legislative intent that such violations be deterred, and that aggrieved consumers have a private cause of action to redress violations." *Hyde v. Abbott Lab'ys, Inc.*, 123 N.C. App. 572, 584, 473 S.E.2d 680, 688 (1996).

~~27.~~33. Washington state has enshrined identical anti-monopoly protections in its Constitution:

> "Monopolies and trusts shall never be allowed in this state, and no incorporated company, copartnership, or association of persons in this state shall directly or indirectly combine or make any contract with any other incorporated company, foreign or domestic, through their stockholders, or the trustees or assignees of such stockholders, or with any copartnership or association of persons, or in any manner whatever for the purpose of fixing the price or limiting the production or regulating the transportation of any product or commodity. The legislature shall pass laws for the enforcement of this section by adequate penalties, and in case of incorporated companies, if necessary for that purpose, may declare a forfeiture of their franchises."

Wash. Const. art. XII, § 22

## **RELEVANT PRODUCT**

~~28.~~34. The product, in this case, is consumer arbitrations.

~~29.~~35. To understand what a consumer arbitration is, where better to look than the AAA's own definitions in their consumer due process protocol,

> Arbitration is a process in which parties submit disputes to a neutral third person or persons for a decision on the merits. Each party has an opportunity to present evidence to the arbitrator(s) in writing or through witnesses. Arbitration proceedings tend to be more informal than court proceedings and adherence to judicial rules of evidence is not usually required. Arbitrators decide cases by issuing written decisions

12

or "awards." An award may or may not be binding on the parties, depending on the agreement to arbitrate. A "binding" arbitration award may be enforced as a court judgment under the terms of federal or state statutes, but judicial review of arbitration awards is limited.

See AAA's Consumer Due Process Protocol at 7, available at https://www.adr.org/sites/default/files/document_repository/Consumer%20Due%20Process%20Protocol%20(1).pdf (accessed Sep. 4, 2024) (hereinafter "AAA's Consumer Due Process Protocol" and incorporated by reference into this complaint).

~~30.~~36. A consumer is defined as: "Consumer refers to an individual who purchases or leases goods or services, or contracts to purchase or lease goods or services, intended primarily for personal, family or household use." *Id.* at 6.

~~31.~~37. For those reasons, the consumer rules do not apply to employment, construction, or commercial cases, which have different rules in the AAA infrastructure.

~~32.~~38. There are 15 principles articulated in the AAA's Consumer Due Process Protocol.

~~33.~~39. The AAA's Consumer Due Process Protocol is explicitly referenced in the AAA's Consumer Arbitration Rules as "These Rules were drafted and designed to be consistent with the minimum due process principles of the Consumer Due Process Protocol." See AAA's Consumer Arbitration Rules p. 1, available at https://www.adr.org/sites/default/files/Consumer-Rules-Web_0.pdf (accessed Sep. 4, 2024).

~~34.~~40. Those principles are:

    A.    Principle 1. Fundamentally Fair Process

    B.    Principle 2. Access to Information Regarding the ADR Program

    C.    Principle 3. Independent and Impartial Neutral; Independent

1          Administration

2      D.    Principle 4. Quality and Competence of Neutrals

3      E.    Principle 5. Small Claims

4      F.    Principle 6. Reasonable Cost

5      G.    Principle 7. Reasonably Convenient Location

6      H.    Principle 8. Reasonable Time Limits

7      I.    Principle 9. Right to Representation

8      J.    Principle 10. Mediation

9      K.    Principle 11. Agreements to Arbitrate

10     L.    Principle 12. Arbitration Hearings

11     M.    Principle 13. Access to Information

12     N.    Principle 14. Arbitral Remedies

13     O.    Principle 15. Arbitration Awards AAA's Consumer Due

14           Process Protocols at 1-3.

15    35.41. Principle 1 of the Consumer due process protocol is Fundamentally-

16 Fair Process and states, "All parties are entitled to a fundamentally-fair ADR

17 process. As embodiments of fundamental fairness, these Principles should be

18 observed in structuring ADR Programs."

19    36.42. The AAA's Consumer Due Process Protocol goes on to state in its

20 "Introduction,"

21         "Yet because consumer contracts often do not involve arm's
22         length negotiation of terms, and frequently consist of
           boilerplate language presented on a take-it-or-leave it basis by
23         suppliers of goods or services, there are legitimate concerns
           regarding the fairness of consumer conflict resolution
24         mechanisms required by suppliers. This is particularly true in
25         the realm of binding arbitration, where the courts are
           displaced by private adjudication systems. In such cases,
26         consumers are often unaware of their procedural rights and

27

28

14

obligations until the realities of out-of-court arbitration are revealed to them after disputes have arisen. While the results may be entirely satisfactory, they may also fall short of consumers' reasonable expectations of fairness and have a significant impact on consumers' substantive rights and remedies."

*Id*. at 4.

~~37.~~43. In its "Reporter's Comments" elaboration on Principle 1 (Fundamentally Fair Process), the AAA states that,

> "**Users of ADR are entitled to a process that is fundamentally fair**. Emerging standards governing consensual and court-connected ADR programs reflect pervasive concerns with fair process. See, e.g., III Ian R. Macneil, Richard E. Speidel, & Thomas J. Stipanowich, Federal Arbitration Law: Agreements, Awards & Remedies Under the Federal Arbitration Act '32.2.1 (1994) [hereinafter Federal Arbitration Law ] (noting "universal agreement" that arbitrators must provide parties with fundamentally-fair hearing). See also Kaiser Permanente Review and Recommendations 1 ("As the sponsor of a mandatory system of arbitration, Kaiser Permanente must assure a fair system to their members, physicians and staff.")

> "Where conflict resolution processes are defined by a written contract, that writing is often viewed by courts as the primary indicator of the "procedural fairness" for which the parties bargained. **As the Advisory Committee recognized, however, ADR agreements in most Consumer contracts are "take-it-or-leave-it" contracts which are not products of negotiation by Consumers**. See David S. Schwartz, Enforcing Small Print to Protect Big Business: Employee and Consumer Rights Claims in an Age of Compelled Arbitration, 1997 Wis. L. Rev. 33, 55-60 (discussing adhesion dimension of pre-dispute arbitration agreements in standardized contracts); Kaiser Permanente Review and Recommendations 28 (noting that many members of a major

HMO have no realistic alternative for medical care**). It is possible, therefore, that contracts to which they have generally assented contain ADR Agreements which fall so far short of Consumers' reasonable expectations that they would not have entered into the agreement had they been aware of the provisions.** Thus, although these Principles attempt to enhance the likelihood that Consumers will have specific knowledge of ADR provisions at the time of contracting, the Advisory Committee also believed it necessary to describe a baseline of reasonable expectations for ADR in Consumer transactions**. These Principles identify specific minimum due process standards which embody the concept of fundamental fairness, including: informed consent; impartial and unbiased Neutrals; independent administration of ADR; qualified Neutrals; access to small claims court; reasonable costs (including, where appropriate, subsidized Provider-mandated procedures); convenient hearing locations; reasonable time limits; adequate representation; fair hearing procedures; access to sufficient information; confidentiality; availability of court remedies; application of legal principle and precedent by arbitrators; and the option to receive a statement of reasons for arbitration awards.**

**"Where provisions in a standardized pre-dispute arbitration agreement fail to meet Consumers' reasonable expectations, there is authority for the principle that courts may properly refuse to enforce the arbitration agreement in whole or in part.** See Restatement (Second) of Contracts ' 211 (1981); Broemmer v. Abortion Services of Phoenix, Ltd., 173 Ariz. 148, 840 P.2d 1013 (1992) (standardized arbitration agreement was unenforceable where its terms fell beyond patient's reasonable expectations); Graham v. Scissor-Tail, Inc., 623 P.2d 165 (Cal. 1981) (arbitration clauses in adhesion contracts are unenforceable if they are contrary to the reasonable expectations of parties or unconscionable). Cf. Cole v. Burns International Security Services, 105 F.3d 1465 (D.C. Cir. 1997) (setting forth minimum due process standards for judicial enforcement of

arbitration agreement in the context of a statutory employment discrimination claim where the employee was required to enter into the agreement as a condition of employment). Procedural fairness in Consumer arbitration CONSUMER DUE PROCESS PROTOCOL STATEMENT OF PRINCIPLES 9 | adr.orgagreements may also be policed under other principles. See, e.g., Stirlen v. Supercuts, 51 Cal. App. 4th Supp. 1519, 60 Cal. Rptr.2d 138 (1997) (finding remedial limits in "adhesive" employment agreement unconscionable); Engalla v. Permanente Med. Grp., 938 P.2d 903 (Cal. 1997) (arbitration agreement was unenforceable if there was substantial delay in arbitrator selection contrary to consumer's reasonable, fraudulently induced, contractual expectations).

**"Because the Principles in this Protocol represent a fundamental standard of fairness, waiver of any of these Principles in a pre-dispute agreement will naturally be subject to scrutiny as to conformity with the reasonable expectations of the parties and other judicial standards governing the enforceability of such contracts.** Assuming they have sufficient specific knowledge and understanding of the rights they are waiving, however, Consumers may waive compliance with these Principles after a dispute has arisen."

*Id.* at p. 10 (emphasis added).

38.44. Principle 3. Independent and Impartial Neutral states that,

Principle 3. Independent and Impartial Neutral; Independent Administration

1. *Independent and Impartial Neutral.* All parties are entitled to a Neutral who is independent and impartial.

2. *Independent Administration.* If participation in mediation or arbitration is mandatory, the procedure should be administered by an Independent ADR Institution. Administrative services should include the maintenance of a panel of prospective Neutrals, facilitation of Neutral selection, collection and distribution of Neutral's fees and expenses, oversight and implementation of ADR rules and procedures, and monitoring of Neutral qualifications, performance, and adherence to pertinent rules, procedures and ethical standards.

3. *Standards for Neutrals.* The Independent ADR Institution should make reasonable efforts to ensure that Neutrals understand and conform to pertinent ADR rules, procedures and ethical standards.

17

4. *Selection of Neutrals.* The Consumer and Provider should have an equal voice in the selection of Neutrals in connection with a specific dispute.

5. *Disclosure and Disqualification.* Beginning at the time of appointment, Neutrals should be required to disclose to the Independent ADR Institution any circumstance likely to affect impartiality, including any bias or financial or personal interest which might affect the result of the ADR proceeding, or any past or present relationship or experience with the parties or their representatives, including past ADR experiences. The Independent ADR Institution should communicate any such information to the parties and other Neutrals, if any. Upon objection of a party to continued service of the Neutral, the Independent ADR Institution should determine whether the Neutral should be disqualified and should inform the parties of its decision. The disclosure obligation of the Neutral and procedure for disqualification should continue throughout the period of appointment.

*Id.* at 11-12.

~~39.~~45. The "Reporters Comments" to principle 3 state that,

> **The concept of a fair, independent and impartial Neutral (or Neutral Panel) is enshrined in leading standards governing arbitration and mediation.** See Federal Arbitration Act ' 10(a) (2); Uniform Arbitration Act ' 12(a) (2); AAA Commercial Rules 12, 13, 14, 19; BBB Arbitration Rules 6, 8. The Joint Standards for Mediators describe mediator impartiality as "central" to the mediation process and require mediators to conduct mediation in an impartial manner. Joint Standards for Mediators, Art. II; Standards for Court-Connected Programs ' 8.1.a. Similar policies animate standards requiring mediators to disclose conflicts of interest and to conduct the mediation in a fair manner. Joint Standards for Mediators, Arts. III, VI; SPIDR Principles, Principles 4.b., c., f.; 6.d., e., i.; Standards for Court-Connected Programs ' 8.1.b.
>
> **When Neutrals are appointed by a court or other organization, the appointing entity has an important obligation to ensure their impartiality. This obligation entails a reasonable level of oversight of Neutral performance.** Comments to the Joint Standards for Mediators indicate that "[w]hen mediators are appointed by a court or institution, the appointing agency shall make reasonable efforts to ensure that mediators serve impartially." Joint Standards for Mediators, Art. II. The Standards for Court-Connected Programs therefore require courts to "adopt a code of ethical standards for mediators [covering, among other things, impartiality and conflict of interest], together with procedures to handle violations of the code." Standards

for Court-Connected Programs ' 8.1. For these and other reasons, the integrity and impartiality of the administrative organization is also important; the growing use of arbitration and mediation in the Consumer context has also raised issues regarding the administration of such processes. See, e.g., Engalla v. Permanente Med. Grp., 928 P.2d 903 (Cal. 1997). See generally Edward Dauer, Engalla's Legacy to Arbitration, ADR Currents, Summer 1997, at 1; Principles for ADR Provider Organizations (setting forth general principles of responsible practice for ADR Provider Organizations, "entities which hold themselves out as offering, brokering or administering dispute resolution services").

In addition to appointing Neutrals, administering institutions often perform many functions which have a direct impact on the conduct of the dispute resolution process, including functions sometimes performed by Neutrals. **The consensus of the Advisory Committee was that the reality and perception of impartiality and fairness was as essential in the case of Independent ADR Institutions as it was in the case of individual Neutrals**. Thus, the Advisory Committee concluded that when an ADR Agreement mandates that parties resort to mediation or arbitration, the administering Independent ADR Institution should be independent of either party and impartial. See, e.g., Kaiser Permanente Review and Recommendations 31 (recommending, first and foremost, the "creation of an independent, accountable administrator" for the Kaiser Permanente arbitration system to counter "perception of bias" raised by "self-administration"). See also Principles for ADR Provider Organizations (draft standards for organizations providing ADR services). **For this and other reasons, this Principle may be the single most significant contribution of the Protocol. In the long term, moreover, the independence of administering institutions may be the greatest challenge of Consumer ADR.**

**Broad disclosure of actual or potential conflicts of interest on the part of prospective Neutrals is critical to the real and perceived fairness of ADR.** Although consenting parties have considerable freedom to choose Neutrals, including

those with experience in a particular industry or profession, the key to informed consent is broad disclosure by prospective Neutrals. **Therefore, a long line of authority under federal and state arbitration statutes establishes the principle that an arbitrator's failure to disclose certain relationships or other facts which raise issues of partiality may result in reversal of an arbitration award**. See generally III Federal Arbitration Law Ch. 28 (discussing legal and ethical rules governing arbitrator impartiality). The principle of disclosure is embodied in leading arbitration rules and ethical standards. See AAA Commercial Rule 19, NASD Code ' 10312; BBB Arbitration Rules 6, 8.

The Joint Standards for Mediators mandate disclosure of "all actual and potential conflicts of interest reasonably known to the mediator" including any "dealing or relationship that might create an impression of possible bias." Joint Standards for Mediators, Art. III. Thereafter, the mediator must await the parties' agreement to proceed with mediation. The same concerns require mediators to identify and avoid conflicts during (and even after) mediation. Id. Cf. Employment Due Process Protocol ' C.4. (mediators and arbitrators have a duty to disclose any relationship which might reasonably constitute or be perceived as a conflict of interest); SPIDR Principles, Principles 4.b., c., f.; 6.d.,e., i.; Standards for Court-Connected Programs ' 8.1.b.

**Although they did not establish it as a requirement under these Principles, most members of the Advisory Committee endorsed the concept of a "list selection" process similar to that employed by the AAA.** See AAA Commercial Rule 14. Under this process, the Independent ADR Institution provides each of the parties with lists of prospective Neutrals and invites the parties to identify and rank acceptable individuals. Mutually acceptable Neutrals are thereby identified. The AAA approach served as the model for other ADR standards. See, e.g., Employment Due Process Protocol ' C.3.; Securities Industry Conference on Arbitration, List Selection Rule (Final Draft, Sept. 18, 1997) (proposed by SICA as modification to Section 8 of the

20

Uniform Code of Arbitration); Proposed Rule Change by National Association of Securities Dealers, File No. SR-NASD097 (proposed by NASD as modification to Rules 10310 and 10311 of the NASD Code of Arbitration Procedure). **The concern was expressed that the list selection approach may create a financial tie between Neutrals in the pool and Providers, who will be "repeat players" in the ADR Program. Such considerations may mandate, among other things, a larger panel of Neutrals, rotating assignments, or disclosure of past awards rendered by arbitrators.**

**In the interest of informed selection, the Advisory Committee recommends that parties be provided with or have access to some information regarding recent ADR proceedings conducted by prospective Neutrals. Cf. Employment Due Process Protocol ' B.3 (recommending that parties be provided with names, addresses, and phone numbers of party representatives in a prospective arbitrator's six most recent cases to aid in selection)…**

**For selection of Neutrals, the Independent ADR Institution might utilize a list procedure similar to that used by the AAA.** The list of prospective Neutrals should include pertinent biographical information, including the names of parties and representatives involved in recent arbitration proceedings handled by the prospective Neutral. Cf. Employment Due Process Protocol 'B.3 (recommending that parties be provided with names, addresses, and phone numbers of party representatives in a prospective arbitrator's six most recent cases to aid in selection). **Each party should be afforded discretion to reject any candidate with or without cause. Failing agreement on a Neutral or panel of Neutrals in this fashion, the Neutral should be appointed by the Independent ADR Institution, subject to objection for good cause.**

Id. at 11 – 14 (emphasis added).

~~40.~~46. It is important to note that the AAA does NOT allow for the

important consumer protection of list selection in consumer arbitrations, while it does in all other types of arbitration.

41.47. However, it is recommended list selection be used in its consumer due process protocols.

42.48. Principle 4. Quality and Competence of Neutrals states, "All parties are entitled to competent, qualified Neutrals. Independent ADR Institutions are responsible for establishing and maintaining standards for Neutrals in ADR Programs they administer."

43.49. Further, the proposed new consumer rules for the AAA, attached as Exhibit 5, remove the right to a final hearing in front of the arbitrator for most cases by pegging the threshold to get a hearing at $50,000. See Exhibit 5, R. R-36, p. 17.

44.50. Because the AAA does now allow for discovery in consumer arbitration cases, the final hearing is often the only opportunity that consumers have to gather any evidence in the case. Without the final hearing, the AAA becomes a full-fledged kangaroo court where Plaintiffs receive no information, and there is no consequence for it.

45.51. The "Reporters Comments" to Principle 4 states that,

> **Organizations providing ADR services for Consumer transactions should have a continuing obligation to monitor the quality of the services they provide.** This obligation requires that they establish and maintain standards for Neutrals within the program which are appropriate to the issues or disputes being addressed. **The SPIDR Commission on Qualifications calls upon private as well as public programs offering ADR services to set and monitor program performance**. See SPIDR Principles, Principle 6, at 3-4. Likewise, the Standards for Court-Connected Programs call upon courts to "ensure that the mediation programs to which they refer cases are monitored

adequately…and evaluated [periodically]." Standards for Court-Connected Programs ' 6.0.

**The most critical element in ADR quality control is the establishment and maintenance of standards of competence for Neutrals within the program**. "Competence" refers to "the acquisition of skills, knowledge and…other attributes" deemed necessary to assist others in resolving disputes in a particular setting. See SPIDR Report on Qualifications at 6**. In 1989, the SPIDR Commission on Qualifications published a list of general skills and areas of knowledge that should be considered by groups establishing competency standards.** See SPIDR Principles, Principle 11, at 4-7.

**While ensuring the competence of Neutrals is always important, it is particularly "critical in contexts where party choice over the process, program or neutral is limited" a reality of many Consumer ADR programs.** See SPIDR Report on Qualifications at 5; SPIDR Principles, Principle 3 at 2 (extent to which Neutral qualifications are mandated should vary by degree of choice parties have over dispute resolution process, ADR Program, and Neutral). **The SPIDR Commission on Qualifications requires private programs to, among other things, establish clear criteria for the selection and evaluation of Neutrals and conduct periodic performance evaluations.** SPIDR Principles at 3. See also SPIDR Report on Qualifications at 6 (Neutrals, professional associations, programs and Consumers should all have responsibility for addressing and assessing Neutral performance); American Bar Ass'n Young Lawyers Div. & Special Comm. On Alternative Means of Dispute Resolution, Resolving Disputes: An Alternative Approach, A Handbook for Establishment of Dispute Settlement Centers 32 (1983) (noting importance of post-mediation evaluation by administering agency).

The Advisory Committee concluded that it would be inappropriate (and, probably, impossible) to set forth a set of universally applicable qualifications for Neutrals in

Consumer disputes. The Advisory Committee's conclusions parallel those of other groups establishing broad standards for the conduct of ADR. See, e.g., SPIDR Report on Qualifications; SPIDR Principles at 1, 2. **As the SPIDR Commission on Qualifications determined, Neutral qualifications are best established by joint efforts of concerned "stakeholders" in specific contexts.** See, e.g., Kaiser Permanente Review and Recommendations 35-36 (recommending involvement of advisory committee in development of arbitrator qualifications).

**It is important for Consumers to have a voice in establishing and maintaining standards of competence and quality in ADR programs. The SPIDR Commission on Qualifications recently observed that "consumers…share a responsibility with programs, [Neutrals]…and associations to join in evaluating and reporting on the performance of [Neutrals]…and programs and contributing to the development of policies and standards on qualifications." SPIDR Report on Qualifications**, 'G.2. at 9. See also SPIDR Principles, Principle 2 at 2 (private entities making judgments about neutral qualifications should be guided by groups that include representatives of consumers of services). **Although Neutral expertise is traditionally a hallmark of arbitration, technical or professional experience often carries with it the perception if not the reality of bias. _From the Consumer's perspective, therefore, an arbitrator who shares the professional or commercial background of a Provider may not be the ideal judge_**. See, e.g., Broemmer v. Abortion Serv. of Phoenix, 840 P.2d 1013 (Ariz. 1992) (adhesion arbitration agreement provided by abortion clinic which, among other things, required arbitrator to be a licensed obstetrician/gynecologist, was unenforceable as beyond reasonable expectations of patient).

**An Independent ADR Institution's responsibility for the qualifications of Neutrals in a particular Consumer ADR program dictates the development of an appropriate training program. Ideally, the training should include a**

24

**mentoring program with experienced Neutrals as well as coverage of applicable principles of Consumer law.** See Mark E. Budnitz, Arbitration of Disputes Between Consumers and Financial Institutions: A Serious Threat to Consumer Protection, 10 Ohio St. J. on Disp. Res. 267, 315 (arbitrators need special legal expertise to address statutory issues respecting consumer claims against financial institutions). **Successful completion of such training should be reflected in the information on prospective Neutrals furnished to the parties prior to selection.** Cf. Employment Due Process Protocol ' C.2.

The Advisory Committee generally supports the concept of broad choice in selection of Neutrals, and recognizes the right of Consumers and Providers to jointly select any Neutral in whom the parties have requisite trust, even one who does not possess all of the qualifications recommended by an ADR Program. Cf. Employment Due Process Protocol 'C.1.; Standards for Court-Connected Programs '13.4 ("Parties should have the widest possible latitude in selecting mediators, consistent with public policy."). **This assumes, of course, that both parties have a true choice in the matter, that they are duly informed about the background and qualifications of the Neutrals proposed, and that all such Neutrals have made full disclosure of possible conflicts of interest in accordance with Principle 3**.

**Elements of effective quality control include the establishment of standards for Neutrals, the development of a training program, and a program of ongoing performance evaluation and feedback. Because the requirements of parties will vary with the circumstances, it will be necessary to establish standards for Neutrals in an ADR Program with due regard for the specific needs of users of the program**. As noted in connection with Principle 3, a helpful model for program administrators is the User Advisory Committee now being utilized by the AAA to establish procedures and policies for ADR in the areas of employment, construction, health care, and other transactional settings. **Such entities could bring Consumer**

**and Provider representatives together to assist in the development and implementation of programs to train, qualify and monitor the performance of Neutrals**.

*Id.* at 14-16 (emphasis added).

~~46.~~52. Principle 6 deals with reasonable costs, and in the Reports Comments, it states,

> **Some ADR Programs serving Consumers are staffed wholly or partly by unpaid volunteers**. See, e.g., BBB Arbitration Rules at 2. The use of such programs, including community dispute resolution centers, may be a satisfactory means of addressing cost concerns associated with Consumer ADR, particularly in cases involving low stakes**. However, concerns have been expressed by some authorities regarding overdependence on volunteer Neutrals**. See Standards for Court-Connected Programs '13.1, Commentary, at 13-2 (warning of dangers of exclusive reliance on volunteers in ADR programs). ***Care must be taken by those responsible for overseeing such programs to make certain that lower cost does not come at the expense of adequately qualified Neutrals.***

*Id.* at 19 (emphasis added).

## RELEVANT MARKET

~~47.~~53. "[I]t is a general and indisputable rule, that where there is a legal right, there is also a legal remedy by suit or action at law, whenever that right is invaded." *Marbury v. Madison*, 5 U.S. 137, 163, 2 L. Ed. 60 (1803).

~~48.~~54. The default venue for litigating disputes has traditionally been Article III courts and state courts of general jurisdiction.

~~49.~~55. However, contracting parties have utilized the Federal Arbitration Act to resolve disputes they have agreed to submit to arbitration.

~~50.~~56. Parties can form multiple levels of agreements concerning

arbitration. At a basic level, parties can agree to send the merits of a dispute to an arbitrator. They can also agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions as well as underlying merits disputes. *See Coinbase, Inc. v. Suski*, 144 S. Ct. 1186, 1192–93, 218 L. Ed. 2d 615 (2024).

51.57. Many consumer product services, such as credit cards, cell phones, telecommunications, and credit reporting agencies, *see infra* and *supra*, opt to place a provision requiring disputes be resolved by arbitration in their adhesion contracts.

52.58. AAA has created a forum that allows companies to require, via adhesion contracts, that consumers agree to unique "Consumer Rules" to arbitrate disputes that arise in consumer contracts.

53.59. Most credit cards, cell phones, all three major credit reporting agencies, and most major telecommunications companies have designated AAA "Consumer Rules" as the sole forum to arbitrate disputes that arise from the services provided and/or any other dispute that arises between the consumer and the company.

54.60. AAA is required by the law of several states to make consumer and employment statistics available to the public.

55.61. AAA had published previously such information on a quarterly basis to its website until recently. https://www.adr.org/ConsumerArbitrationStatistics, last visited March 17, 2025.

56.62. As of the date of the filing of this Complaint, the data referenced in this Complaint could no longer be accessed on its website via an obvious link.

57.63. The website directs users to call "Statistics and In-House Research Department at 877.495.4185."

58.64. The phone number is not for statistics or in-house research. It is for website support.

59.65. Website support connects callers to an offshore call center that also was not statistics or in-house research and who advised to call customer support.

60.66. When the customer support number is called, there is no live person to answer the phone but rather an automated message system that suggests sending an email.

61.67. This lack of access via the website, including the run-around designed to get rid of inquiries, is oppositional to AAA's duty to provide public access to the statistics it is required to make available to the public.

62.68. The allegations herein are based on the 2024 First Quarter consumer reporting spreadsheets previously readily accessible as a link on the AAA website.

63.69. Of the 103 most used credit card agreements, the top five cellular company contracts, by subscribers, and the top six telecom provider agreements in North Carolina and West Virginia, Plaintiff's counsel could only identify three arbitration forums used.

64.70. Those three companies are the AAA, JAMS, and National Arbitration and Mediation (hereinafter NAM).

65.71. AAA is the largest in consumer law, JAMS is the second largest, and NAM is a distant third such that they do not have enough data to provide any statistics.

66.72. The AAA has had 179,288 arbitrations filed with it since 2010, according to its spreadsheet available at https://www.org/sites/default/files/document_repository/ConsumerReport_Q1_2024.xlsx (accessed Aug. 14, 2024) (hereinafter referred to as AAA Spreadsheet).[11]

---

[11]. Attached as Exhibit 1 in PDF format, which may be difficult to read. The best format is an Excel spreadsheet due to the sheer volume of data. However, AAA appeared to have removed this data from its site as an Excel spreadsheet. AAA has all such data within its unique control.

67.73.Of the 179,288 AAA arbitrations on its spreadsheet, 150,358 are designated true consumer arbitrations (that is, not employment, real property, or construction, which would fall under different rules). See AAA Spreadsheet.

68.74.JAMS has had 23,593 arbitrations filed in its forum as stated on its spreadsheet available at https://www.jamsadr.com/files/uploads/documents/jams-consumer-case-information.xlsx (accessed Aug. 14, 2024) (hereinafter referred to as JAMS Spreadsheet).[12]

69.75.Of the 2325,593 JAMS arbitrations on its spreadsheet, 8,326 are listed as consumer arbitrations (that is, not employment, real property, or construction). See JAMS Spreadsheet.

70.76.NAM's spreadsheet of consumer and employment arbitrations is available at https://www.namadr.com/content/uploads/2024/07/Website-CA-Disclosures-Q2-2024-W.O.-NAM-ID-W.O.-CONSUMER-NAME.xls, (accessed Aug 16, 2024) (hereinafter NAM Spreadsheet).[13]

71.77.NAM's spreadsheet contains only 93 consumer and employment arbitrations that have been arbitrated with NAM.

72.78.Of the 93 arbitrations on the NAM spreadsheet, 49 are listed as consumer arbitrations (that is, not employment).

73.79.NAM appears to have entered the market in 2019 and is not a particularly important player.

74.80.All three spreadsheets include both consumer and employment arbitrations.

---

[12] Exhibit 2, attached as a PDF, would be best viewed in Excel spreadsheet format, which JAMS has within its unique control.

[13] AExhibit 3, attached as Exhibit 3 in a PDF format, would be best viewed in Excel spreadsheet format, which NAM AAA has within its unique control.

29

1    ~~75.~~81.93 + 179,288 + 23,593 = 202,973 total arbitrations.[14]

2    ~~76.~~82.When accounting solely for consumer arbitrations filed, AAA had

3    150,358, JAMS had 8,326, and NAM had 49.

4    ~~77.~~83.There were 158,733 consumer arbitrations identified by AAA,

5    JAMS, and NAM.

6    ~~78.~~84.Of the 158,733 consumer arbitrations in the US listed on the

7    spreadsheet, the AAA comprises 94% of the arbitrations, JAMS 5%, and NAM

8    comprises .0003%.

9    ~~79.~~85.On a national level, consumers win only 27% of the time in the AAA,

10   or 1,264 of the 4,748 arbitrations on the AAA spreadsheet.

11   ~~80.~~86.That's compared to a 40%-win rate at JAMS or 302 of 758

12   arbitrations.

13   ~~81.~~87.When filtered for consumer-filed arbitrations only, the consumer win

14   rate in the AAA jumps by 1% to 28% or 1,233 arbitrations out of 4,326.

15   ~~82.~~88.JAMS jumps by 2% to a 42%-win rate for consumer-initiated

16   arbitrations or 274 of 648 arbitrations.

17   ~~83.~~89.There is a breakdown in the competitive conditions in the

18   marketplace of consumer arbitrations.

19   ~~84.~~90.AAA receives 94% of all consumer arbitration filings yet has a

20   bafflingly low consumer win rate.

21   ~~85.~~91.AAA has priced itself so low that it prohibits market competitors

22   from offering comparable arbitration services to consumers.

23   ~~86.~~92."A consumer deprived of money by reason of allegedly

24   anticompetitive conduct is injured in 'property' within the meaning of § 4 [of the

25   Clayton Act.]" *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344, 99 S. Ct. 2326, 2333,

26

27   _____

[14] The totals for pure consumer arbitrations are slightly lower for each forum and are discussed in detail later in the complaint.

28

60 L. Ed. 2d 931 (1979).

87.93. The basic and underlying purposes of anti-trust laws are to preserve competition and to protect the consumer.

88.94. Plaintiffs is aare consumers who has have contracted with companies to resolve disputes via the AAA's Consumer Rules arbitration forum.

89.95. Plaintiffs has have been directly injured by the lessening of competition due to AAA's monopolistic practices.

90.96. Plaintiffs seeks to forbid exclusivity—first on Plaintiff's own behalf and implicitly on behalf of others.

91.97. Plaintiffs seeks to destroy an anticompetitive arrangement.

92.98. Plaintiffs has have been deprived of money because of AAA's anti-competitive conduct.

93.99. Plaintiffs can efficiently enforce the anti-monopoly laws.

94.100.    Plaintiffs has have been injured by being prevented from accessing competitors in the consumer arbitration marketplace, which has led to demonstrably worse results for their litigation.

95.101.    Plaintiffs is are an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement and access to a competitive dispute resolution marketplace. AAA manipulates the consumer arbitration market in which the Plaintiffs is are active.

96.102.    Plaintiff's' antitrust injury reflects the anticompetitive effect of the violation or of anticompetitive acts made possible by the violation.

97.103.    Plaintiff's' injury is of the type the antitrust laws were intended to prevent and directly results from the very conduct that makes AAA's acts unlawful.

98.104.    "Under either statute, two prerequisites to recovery remain the same, requiring a plaintiff seeking to establish competitive injury resulting from

a rival's low prices to prove that

> (1)  the prices complained of are below an appropriate measure of the rival's costs, and
>
> (2)  the rival has a reasonable prospect--or, under the Sherman Act, a dangerous probability--of recouping the rival's investment in below-cost prices." *Id*.

99.105.     "Primary-line competitive injury, as required under the price discrimination provisions of 2(a) of the Clayton Act as amended by the Robinson-Patman Act (15 USCS 13(a)), is of the same general character as the injury inflicted by predatory pricing schemes actionable under 2 of the Sherman Act (15 USCS 2)[.]" *Brooke Grp. v. Brown & Williamson Tobacco Corp*., 509 U.S. 209, 212, 113 S. Ct. 2578, 2582 (1993)

100.106.     AAA willfully acquired or maintained its market power through anticompetitive conduct, rather than through legitimate means such as offering a superior product, exercising business acumen, or by historical accident, in violation of 15 U.S.C. § 2 *et seq*

101.107.     AAA acted with the intent to prevent competitors from entering the consumer arbitration market and was not merely the consequence of shutting out competition

102.108.     The geographical market in this arbitration is defined as the United States of America.

## **BACKGROUND**

### A.   **The Structure of the American Arbitration Association v. JAMS**

103.109.     The AAA consumer rules are available at https://adr.org/sites/default/files/Consumer%20Rules.pdf. Exhibit 1.

104.110.     The AAA has a unique set of rules for consumers that is drastically more restrictive in what it allows than the rules for other types of

arbitrations.

### i. Arbitrator Selection

~~105.~~111.    The AAA consumer rules do not allow for any choice or strike list of arbitrators.

~~106.~~112.    Consumers in the AAA are stuck with whatever arbitrator the AAA selects and cannot recuse them unless they can demonstrate a clear conflict.

~~107.~~113.    The JAMS Rules allow for a strike list of arbitrators to be provided to consumers of at least five arbitrators. See JAMS Rule 15(b) available at https://www.jamsadr.com/rules-comprehensive-arbitration/#Rule-15 (accessed Aug. 14, 2024). Exhibit 2.

~~108.~~114.    JAMS utilizes arbitrators who, by and large, have judicial experience.

~~109.~~115.    AAA utilizes arbitrators who, by and large, work for or are retired from corporate defense firms that are regularly averse to consumers.

~~110.~~116.    Further, as seen in Exhibit 4, AAA's Demographic Report Quarter 3, 2024, the AAA's arbitrators are not representative of the population at large:

        A.    75.1% male.

        B.    96.7% with no disability.

        C.    85% white.

~~111.~~117.    The AAA's refusal to provide a strike list violates principle 3 of their Consumer Due Process Protocol.

~~112.~~118.    AAA does not provide a list of its neutrals or their resumes online; instead, it has a page with broken links that do nothing. See The AAA National Roster of Arbitrators and Mediators, available at https://www.adr.org/aaa-panel (accessed March 17, 2025).

~~113.~~119.    The reasons AAA offers for refusing to publish the roster of

arbitrators include, for example, that their database is proprietary and not made available to the public; there are thousands of arbitrators in different areas of the law, where some subjects are narrow with panels of few expert arbitrators and other panels are large; some forced arbitration clauses provide the method for selection of arbitrators, while others are silent; not all arbitrators are available. https://www.adr.org/sites/default/files/document_repository/Why-the-AAAs-Roster-of-Arbitrators-is-Not-Publicly-Available.pdf, last visited March 17, 2025.

114.120.    This violates AAA's Principles 1, 2, 3, 4, and 13 of the AAA's Consumer Due Process Protocol.

115.121.    JAMS provides all of its arbitrators with resumes online on an easy-to-use website. See Search Neutral Directory, available at https://www.jamsadr.com/neutrals/search (accessed March 17, 2025).

116.122.    While Plaintiff can obtain the names of the neutrals for Arizona, West Virginia, Washington, and North Carolina from the AAA Statistics Spreadsheet, however, no resumes or other information is provided.

117.123.    Some AAA arbitrators get assigned more arbitrations than others. The AAA does not clearly disclose why or how arbitrators are selected in each case.

118.124.    This violates AAA's Principles 1, 2, 3, 4, and 13 of the AAA's Consumer Due Process Protocol.

119.125.    JAMS' process is based on a geographical region (typically several states) and uses a strike list.

120.126.    Upon information and belief, AAA takes no action to recruit neutrals who work on behalf of consumers into its neutrals list.

121.127.    AAA's rules regarding arbitrator selection are far outside the norm for arbitrator selection in other rules for private arbitrations both within the AAA and with other providers.

122.128.    As a result of the Defendant's actions, the Plaintiffs was were harmed by having no choice of forum and no choice of arbitrator.

123.129.    Further, the proposed updated consumer rules issued by the AAA remove the ability for consumers with arbitration values of $50,000 to get a final hearing. Cases below that amount go to a "desk arbitration."

124.130.    Because the AAA does not allow discovery in consumer cases, the new rules effectively deny consumers access to discovery, leaving the final hearing as often their only opportunity to develop the record.

125.131.    This change strengthens the AAA's monopoly power by now being the forum where, in the vast majority of consumer arbitrations, consumers do not even receive a hearing. Other forums can only compete by stripping consumers' rights to a hearing.

### ii.    Rules Regarding Discovery

126.132.    The AAA Consumer Rules do not provide for any discovery by consumers.

127.133.    The AAA Consumer Rules do not allow for any depositions by consumers.

128.134.    AAA arbitrators routinely advise consumers that they are not entitled to any discovery or depositions.

129.135.    JAMS rules allow discovery and depositions, and JAMS arbitrators routinely allow full discovery. Exhibit 2, Rule 17.

130.136.    The AAA Consumer rules currently provide for a hearing, with dispositive motions permitted only on the condition that a party has shown substantial cause. Exhibit 2, Rule 33.

131.137.    AAA has proposed changing the rules to permit dispositive motions that would eliminate or severely curtail consumer ability to have a full and fair evidentiary hearing, especially when there may be no or limited

1    discovery.

2        132.138.    This proposed change, among many others, would create an

3    unfair advantage against consumers in favor of corporate defendants with unique

4    and sole possession of evidence consumers need to prove their cases.

5        **iii.    Fees and Costs of Arbitration**

6        133.139.    The AAA lists some of its fees and costs under the consumer

7    rules                              available                              at

8    https://www.adr.org/sites/default/files/Consumer_Fee_Schedule_2.pdf (accessed

9    March 17, 2025) (hereinafter AAA Consumer Fee Schedule). Exhibit 3.

10       134.140.    Under its 2023 Fee Schedule, theThe AAA charged charges

11   consumers $225 200 to file a demand.

12       135.141.    JAMS charges consumers $250 to file a demand.

13       136.142.    Although the filing fees for the consumer are similar, the fees

14   for the business drastically differ.

15       137.143.    The AAA's consumer rules require an arbitration management

16   fee of $1,400, which the business pays.

17       138.144.    The AAA, during most of the class period, charged a flat rate

18   of $2,500 for arbitrator compensation, including one day of hearings, the final

19   award (regardless of how many hours it took to write), and a preliminary

20   scheduling conference with the arbitrator.

21       139.145.    If the arbitration extended into a second day of hearings, the

22   arbitrator would receive another $2,500 per day; however, upon information and

23   belief, multiday hearings are rare in consumer hearings.

24       140.146.    The AAA rules stated that the business pays for arbitrations

25   with multiple telephone conferences, motions practice, post-hearing briefings,

26   interim awards, partial awards, and, most importantly, awards containing findings

27   of fact and conclusions of law outside of the $2,500 fee.

28

141.147.    The AAA recently replaced the flat fee system with a $300 per hour rate. This was not intended to increase the compensation for arbitrators because the rates are still significantly below the standard.

142.148.    It actually results in lower pay for arbitrators because most cases settle quickly.

143.149.    The primary intention behind this change was to reduce costs for businesses involved in mass arbitrations, with no intention of benefiting consumers, improve fairness, or to attract more competent arbitrators.

144.150.    The original flat fee of $1,250 represented nearly four hours of work at a rate of $300 an hour. Since most arbitrations settle quickly, this is a pay cut in most cases.

145.151.    Further, the reduced rate of $300 forces competitors and individuals wishing to enter the arbitration market to lower their rate from the current market rate, upon information and belief, around $600, to be competitive or leave the market altogether.

146.152.    The $300 hourly cap on arbitrator compensation is unfair to consumers because it discourages competent arbitrators from becoming AAA arbitrators and taking consumer cases.

147.153.    Consumers do not benefit from the $300 an hour cap on arbitrator compensation in any way, shape, or form.

148.154.    However, the rules also state "Any determination by the AAA on whether the business will be responsible for additional arbitrator compensation is in the sole discretion of the AAA and such decision is final and binding." AAA Consumer Fee Schedule, p. 4.

149.155.    Upon information and belief, the AAA actively discourages and routinely does not require businesses to pay the arbitrator for additional services.

150.156.    AAA Consumer Rules significantly disincentivize arbitrators from spending time and attention on consumer filings because their compensation is fixed regardless of the amount of work performed.

151.157.    This violates principles 1, 2, 3, and 4 of the consumer due process principles. Principle 4 explicitly warns in its comments about under-funding neutrals and the risks involved.

152.158.    JAMS publicly discloses the consumer arbitration fees on its website.

153.159.    The average JAMS arbitrator fee for arbitration that went to a judgment of some kind (excluding employment and construction arbitrations) is $12,949 going back to 2012.

154.160.    Upon information and belief, the current average arbitrator deposit required by JAMS of businesses at the start of litigation is between $15,000 and $20,000 per arbitration.

155.161.    The arbitrator deposit during the bulk of the class period in the AAA is half the $2,500 daily fee.

156.162.    Recently, that was reduced to just the arbitrator's rate of $300 an hour, which means the arbitrator can earn almost nothing if the case settles.

157.163.    Upon information and belief, no arbitrator deposit is required, and unlike most other forums, like JAMS, the arbitrator can earn nothing if he works no time on the file due to a quick settlement.

158.164.    The practice of underpaying arbitrators continues in a different form in the new capped $300 an hour rate.

159.165.    Upon information and belief, the AAA arbitrator deposit is approximately 10% of the typical deposit at JAMS.

160.166.    The AAA only limits arbitrator fees under its Consumer Rules.

161.167.    AAA does not limit arbitrator fees in employment, labor,

healthcare, construction, or other types of arbitrations.

      A.    AAA Employment Rules: "Arbitrator compensation is not included as part of the administrative fees charged by the AAA. Arbitrator compensation is based on the most recent biography sent to the parties prior to appointment. The company shall pay the arbitrator's compensation unless the individual, post dispute, voluntarily elects to pay a portion of the arbitrator's compensation. Arbitrator compensation, expenses, and administrative fees are not subject to reallocation by the arbitrator(s) except upon the arbitrator's determination that a claim or counterclaim was filed for purposes of harassment or is patently frivolous." Available at https://go.adr.org/employmentfeeschedule (Accessed Aug 18, 2024).

      B.    AAA Construction Rules: "For both schedules, administrative fees are based on the amount of the claim or counterclaim and are to be paid by the party bringing the claim or counterclaim at the time the demand or claim is filed with the AAA. *Arbitrator compensation is not included in either schedule*. Unless the parties' agreement provides otherwise, arbitrator compensation and administrative fees are subject to allocation by an arbitrator in an award." (emphasis in original) Available at https://go.adr.org/constructionfeeschedule (accessed Aug 18, 2024).

      C.    Labor Rules: "Unless mutually agreed otherwise, the arbitrator's compensation shall be borne equally by the parties, in accordance with the fee structure disclosed in the

arbitrator's biographical profile submitted to the parties." Available at, https://www.adr.org/sites/default/files/Labor_Arbitration_Fee_Schedule_0.pdf (accessed March 17, 2025).

D.   Commercial Arbitrations: For both schedules, administrative fees are based on the amount of the claim or counterclaim and are to be paid by the party bringing the claim or counterclaim at the time the demand or claim is filed with the AAA. *Arbitrator compensation is not included in either schedule.* Unless the parties' agreement provides otherwise, arbitrator compensation and administrative fees are subject to allocation by an arbitrator in an award. Available at, https://www.adr.org/sites/default/files/Commercial_Arbitration_Fee_Schedule_1.pdf (accessed march 17, 2025).

162.168.    The AAA limits consumer arbitrator compensation to obtain an unfair advantage in the consumer arbitration market.

163.169.    Limiting arbitrators' compensation, as in the AAA Consumer Rules, is not a typical practice in the industry.

164.170.    JAMS compensates arbitrators on an hourly basis.

165.171.    It is not a typical practice within AAA to cap arbitrator compensation for anything except consumer arbitrations.

166.172.    AAA's other areas (employment, construction, labor, etc.) compensate arbitrators hourly without caps.

167.173.    JAMS does not put their arbitrators' fee amounts online but states on their webpage that arbitrators are paid their hourly rate as set by the arbitrator. *See* Arbitration Schedule of Fees and Costs, available at https://www.jamsadr.com/arbitration-fees, (accessed March 17, 2025).

168.174.    Further, in all of the areas (rules) in which the AAA accepts arbitrations (employment, construction, labor, etc.), the AAA allows arbitration strikes, access to discovery, and depositions in most arbitrations.

169.175.    The AAA has elected to make only its Consumer Rules far outside industry norms of arbitration rules and arbitrator compensation to corner the market on consumer arbitrations.

170.176.    As a result of Defendant's anticompetitive actions, Defendant has been unjustly enriched to tens and possibly hundreds of millions of dollars.

171.177.    As a result of the Defendant's anticompetitive rules, which are outside the norm for both other types of arbitration accepted by the AAA and the rules at other forums, the Defendant has gained an unfair advantage and a monopoly in the area of consumer arbitrations by creating rules that prevent consumers from being able to adjudicate their rights.

**B.    Consumer Arbitration Outcomes at the American Arbitration Association and JAMS**

172.178.    The Plaintiff's complaint only concerns consumer arbitrations, not employment or construction arbitrations, which fall under different rules at the AAA.

173.179.    AAA arbitration statistics only go back to approximately January 2017. Ex. 1, AAA Spreadsheet.

174.180.    JAMS arbitration statistics have consumer and employment arbitration data going back to May of 2012. Ex. 2, JAMS Spreadsheet.

175.181.    Unless indicated otherwise, the data below is only for arbitrations that went to the final hearing and not the tens of thousands of arbitrations filed in arbitration but settled before a final hearing.

176.182.    The data below does not include the untold number of matters

1  that were never filed due to the chilling effect of the AAA Consumer Rules and

2  outcomes.

3  177.183.    The AAA statistics spreadsheet has 179,252 total arbitrations

4  on it.

5  178.184.    The JAMS spreadsheet, which includes five additional years,

6  has 23,592 arbitrations.

7  179.185.    This means that the AAA accounts for approximately 87% of

8  the filed arbitrations between the two, while JAMS accounts for 13%. These

9  numbers are not filtering out employment and construction cases yet; this is just

10 all arbitrations generally.

11 180.186.    Upon information and belief, the reason for this disparity is

12 the vast majority of consumer arbitration agreements provide for no choice of

13 forum and require consumers to use the AAA only.

14 181.187.    On a national level, consumers win only 27% of the time in

15 the AAA, or 1,264 of 4,748 arbitrations.

16 182.188.    That's compared to a 40%-win rate at JAMS or 302 of 758

17 arbitrations.

18 183.189.    When filtered for consumer-filed arbitrations only, the AAA's

19 consumer win rate jumps by 1% to 28% or 1,233 arbitrations out of 4,326.

20 184.190.    JAMS jumps by 2% further to a 42%-win rate for consumer-

21 initiated arbitrations or 274 of 648 arbitrations.

22 185.191.    In the seven years of data available, consumers won

23 approximately 21% of the time in Arizona AAA arbitrations or 15 of the 72

24 consumer arbitrations that went to a final hearing.

25 186.192.    In the twelve years of data available, consumers won in

26 Arizona JAMS arbitrations approximately 38% of the time, or 3 of the 8

27 arbitrations that went to a final hearing. However, this is likely not a large enough

28

sample to provide significant data.

187.193.    Upon information and belief, the reason there are so few JAMS arbitrations in Arizona is because of the AAA monopoly.

188.194.    In the seven years of data available, consumers won approximately 27% of the time in North Carolina AAA arbitrations, or 96 of 252 arbitrations that went to a final hearing.

189.195.    In the twelve years of data available, consumers won in North Carolina JAMS arbitrations approximately 66% of the time or 88 of 133 arbitrations.

190.196.    In the seven years of data available, consumers won in West Virginia AAA arbitrations 11% of the time or 4 of 34 arbitrations.

191.197.    There are so few JAMS West Virginia arbitrations that win rate data is unavailable. Only one arbitration of the fifteen filings went to a hearing, and the consumer lost.

192.198.    Consumers in Washington State win at an average 42% of the time in the AAA. This beats the national average of 27%.

193.199.    However, consumers in JAMS in Washington State win 66% of their cases.

194.200.    The consumer initiated all of the West Virginia arbitrations discussed above.

195.201.    In all the awards to consumers in the 252 AAA arbitrations that went to a final hearing in North Carolina, consumers were awarded an aggregate total of $1,542,724. However, that number is skewed by a few significant awards. The average is $16,070 per arbitration won, with a median of $12,042.

196.202.    JAMS, on the other hand, has awarded $2,730,654 to North Carolina consumers in over half as many arbitrations (133), with an average award

of $31,030 per arbitration taken to a final hearing.

197.203.    The AAA in West Virginia has awarded consumers a paltry $5,915 over the 34 arbitrations tried to a final hearing with a median award of $1,506.50.

198.204.    Consumers only won 4 of the 34 arbitrations consumers filed in the AAA in West Virginia.

199.205.    Of **consumer-filed** arbitrations in West Virginia, businesses were awarded $60,840.

200.206.    Businesses defending arbitrations filed against them in the AAA in West Virginia were awarded *ten times* the amount awarded to West Virginia consumers who brought the claims.

201.207.    Upon information and belief, the AAA in West Virginia is punitive to consumers instead of providing justice.

202.208.    Upon information and belief, the AAA fails to monitor the quality of its arbiter panels and their results as required by Principle 4 of the AAA's Consumer Arbitration Due Process Protocols.

203.209.    Some "frequent fliers" enjoy even greater rates of success.

204.210.    T-Mobile has had 2,616 consumer arbitrations filed against it in the AAA by consumers, nationally.

205.211.    Of the 2,616 arbitrations consumers filed against T-Mobile, 103 went to final judgment, and T-Mobile won 89 for an enviable 86%-win rate.

206.212.    Other frequent fliers enjoy similar enviable win rates on consumer-filed arbitrations on a national level.

A.    AT&T appears with 2,844 on the AAA arbitration

spreadsheet. Of those 2,844, 261 went to a final judgment.[15]
Of the 253 arbitrations that were not a "consumer/business"
win, AT&T won 216. That's an 85%-win rate for AT&T and
a 15%-win rate for consumers and remarkably similar to T-
Mobile's success in arbitration.

B.    Citibank, N.A., appears with 818 arbitrations in the AAA filed
against it, of which 65 went to a final judgment. The bank won
in 53 of those arbitrations, or 81% of the time, while
consumers won 19% of the time.

C.    c. Verizon appears with 1075 AAA arbitrations filed by
consumers, of which 161 went to trial. Of those 161
arbitrations, Verizon won 140, or 86%. Consumers won 14%,
and a pattern is starting to emerge.

D.    Experian, the credit reporting agency, totals 12 consumer
cases that went to final hearing in the AAA out of 162
arbitrations filed and has a 100%-win rate.

~~207.~~213.    Under the AAA employment rules, the AAA has handled
19,484 arbitrations, according to its spreadsheet.

~~208.~~214.    The AAA uses different rules for employment arbitrations,
which include arbitrator strikes, arbitrators are paid a reasonable amount, and
rules will allow for some discovery.

~~209.~~215.    Of the 1,303 employment arbitrations on the AAA spreadsheet
that went to a final judgment, the employee was given an award in 633 arbitrations

---

[15] Eight of the cases are listed as both the consumer and business winning, however, that is misleading. In only two of those cases was the consumer awarded more than the business, one for $1,500 and one for $48. In the other three cases, consumers were awarded between two and three-figure judgments. AT&T was awarded 5 figure judgments in all of them.

at the national level. While still low, that represents a 49%-win rate for employees or nearly triple the win rate of consumers in cell phone arbitrations against T-Mobile, AT&T, and Verizon, where there are no strikes, discovery, and inadequate arbitrator compensation.

210.216.    Upon information and belief, the high business win rate is because of the low arbitrator compensation, the use of nearly exclusively corporate defense attorneys as arbitrators, and restrictive rules, which is the reason for the meager 27% national win rate by consumers.

211.217.    As demonstrated above, because Defendant abuses its monopoly power, consumers are harmed by the lack of choice in the area of consumer arbitration forum in forum selection clauses, in the rules that apply in those closes, and the rights and remedies available.

**C.    AAA as a Monopoly**

212.218.    Plaintiff's complaint only concerns itself with consumer arbitrations and not employment or construction arbitrations which fall under different rules at the AAA.

213.219.    Based on the companies' data sheets online, the AAA has approximately 88%, JAMS has 12%, and NAM has a .0005% market share in arbitrations, which includes the consumer and employment arbitration market.

214.220.    Of the 179,288 AAA arbitrations on its spreadsheet, 150,358 are designated true consumer arbitrations (that is, not employment, real property, or construction, which would fall under different rules). See AAA Spreadsheet attached as Exhibit 1.

215.221.    Of the 25,593 JAMS arbitrations on its spreadsheet, 8,326 are listed as consumer arbitrations (that is, not employment, real property, or construction). Ex. 2, JAMS Spreadsheet.

216.222.    Of the 93 arbitrations on the NAM spreadsheet, 49 are listed

as consumer arbitrations (that is, not employment). Ex. 3, NAM spreadsheet.

~~217.~~223.    150,358 + 8,326 + 49 = 158,733 arbitrations.

~~218.~~224.    Of the 158,733 consumer arbitrations in the US listed on the spreadsheet, the AAA has 94% of the arbitrations, JAMS has 5%, and NAM has .0003%.

~~219.~~225.    The AAA sets consumer arbitration rates so low that no other forum can compete against them.

~~220.~~226.    The AAA sets consumer arbitration rates so low that only corporate defense counsel with large firm sponsorship or retired attorneys can afford to be arbitrators.

~~221.~~227.    Consumer protection advocates cannot afford to divert resources from their practices to work as AAA arbitrators when the compensation rates are so low and capped.

~~222.~~228.    The AAA sets arbitrator compensation rates at approximately 10% of the cost of private consumer arbitration in other forums to stifle competition and to create and perpetuate a monopoly.

~~223.~~229.    Plaintiffs examined 103 credit card agreements prior to filing and 61 of those agreements chose only the AAA as the forum.[16] Those agreements were in these cards:

- Comenity Capital Bank - Academy Sports
- Comenity Capital Bank - AAA
- Comenity Capital Bank - All Pets
- Comenity Capital Bank - Big Lots
- Comenity Capital Bank - Boot Barn
- Comenity Capital Bank - Burlington
- Comenity Capital Bank - Cosmo

---

[16] Plaintiff utilized the Consumer Financial Protection Bureaus' Credit Card Agreement Database, available at https://www.consumerfinance.gov/credit-cards/agreements/ (accessed Aug. 18, 2024).

- Comenity Capital Bank - Forever21
- Comenity Capital Bank - Game Stop
- Comenity Capital Bank - Harley Davidson
- Comenity Capital Bank - Ikea
- Comenity Capital Bank - Land's End
- Comenity Capital Bank - Petco
- Comenity Capital Bank - Ross
- Comenity Capital Bank - Sephora
- Comenity Capital Bank - Toyota Rewards
- Comenity Capital Bank - Ulta
- Comenity Capital Bank - Zales
- 1st United Credit Union
- Ally Credit Card
- Barclays Bank Delaware
- Celtic Bank Corp
- CitiBank - Aadvantage
- CitiBank - Aadvantage
- CitiBank - AT&T
- CitiBank -Best Buy
- CitiBank - Bloomingdales
- CitiBank - Brooks Brothers
- CitiBank - Citi Custom Cash
- ALL CITIBANK CARDS
- Coastal Community Bank
- Comenity Bank - Ann Taylor
- Comenity Bank - Arhaus
- Comenity Bank - Avenue
- Comenity Bank - Bealls
- Comenity Bank - Brylane
- Comenity Bank - Buckle
- Comenity Bank - Caesars
- Comenity Bank - Catherines
- Comenity Bank - Eddie Bauer
- Comenity Bank - Express
- Comenity Bank - J. Crew
- Comenity Bank - Jared
- Comenity Bank KingSize Credit Card

- Comenity Bank - PlayStation
- Comenity Bank - Sportsman's Guide Buyers Club
- Comenity Bank - Talbots
- Comenity Bank - Victoria's Secret
- Credit One, N.A.
- Discover Bank
- Farm Bureau Bank, FSB
- First National Bank of Omaha - Platinum
- First National Bank of Omaha - Green Light Family Cash Card
- First National Bank of Omaha - Sheetz
- Goldman Sachs - Apple Card
- HSBC Bank USA, N.A. - Elite Card
- HSBC Bank USA, N.A. - Premier Card
- SoFi Bank, N.A.
- Truliant Federal Credit Union
- USAA
- Wells Fargo

224.230.    Of the top five cellphone providers in the United States by subscriber numbers, all five allow only the AAA as the arbitration forum available to them. Those companies are:

- AT&T
- Verizon
- T-Mobile
- US Cellular
- Boost Mobile

225.231.    Of the top eight internet providers in North Carolina and West Virginia, seven allow for only the AAA in their terms of service:

- Windstream
- Frontier Communications
- Spectrum
- Google Fiber
- ATT Fiber
- Verizon Home Internet
- T-Mobile Home Internet

49

- Optimum Internet
- Starlink

226.232.    Of the three major credit reporting agencies in the United States, all of them required the use of the AAA only for disputes.

- Experian
- Equifax
- TransUnion

227.233.    These corporations and countless others, looking to minimize the costs of arbitration, have chosen the AAA as the only forum available to consumers in their arbitration agreements for the majority of consumer agreements in America.

228.234.    Of the 126 terms of services and contracts Plaintiffs surveyed before filing this arbitration, 81 required all disputes to go the AAA only without a choice to consumers.

229.235.    This represents 63% of all contracts surveyed but is a much higher percentage in some industries, including 100% in cell phone contracts surveyed, 100% of credit reporting agencies, 89% of telecoms, 80% of payment apps, and 59% of credit card agreements[17].

230.236.    The AAA does not offer a neutral arbitration service but instead has rules that provide consumers with no choice of arbitrator, no discovery, no depositions, and no appeal.

231.237.    These limitations are outside the industry norm for arbitration and create a forum that is not neutral. In fact, according to the AAA's own spreadsheet, most consumers lose the arbitrations: 79% in Arizona, 89% in West Virginia, 73% in North Carolina, and 58% in Washington.

---

[17] Very few companies do not have arbitration agreements that Plaintiff could find. Those that do include Capital One, TD Bank, Facebook, etc. However, this complaint is not interested in companies that choose not to use arbitration services because they are not subject to AAA's monopolistic role.

232.238.    Nationally, consumers also lose 73% of consumer arbitrations in the AAA.

233.239.    Further, by paying arbitrators paltry flat-rate sums and not ensuring that arbitrators will be paid for reviewing discovery, preparing findings of facts and conclusions of law, and other litigation, the AAA has ensured that arbitrators do not spend much time on arbitrations and fully consider all the facts in violates of principles 1, 3, and 4 of the AAA's Consumer Due Process Protocol.

234.240.    The comments to Principle 4 of the AAA's Consumer Due Process Protocol explicitly warn of the risks of underfunding arbiters.

235.241.    Further, the AAA offers various tools on its website to create arbitration clauses that select only the AAA as the arbitral forum for all disputes, including an AI Tool and sample arbitration clauses. See AAA-ICDR Clause Drafting, available at https://www.adr.org/Clauses, last visited March 17, 2025.

236.242.    The effect of the AAA's anticompetitive conduct is that no forum can compete in price and still offer a neutral arbitration.

237.243.    As a result of the AAA's anticompetitive practices in its consumer arbitration rules, all contract holders with an AAA-only clause are limited in their choices.

238.244.    Further, because of the AAA's extremely poor success rates for consumers, businesses use the threat of going to the AAA in consumer arbitrations to force low settlements. The AAA website states that consumers lose the vast majority of arbitrations. See AAA Spreadsheet attached as Exhibit 1.

239.245.    As a result of the defendant's conduct, companies that wish to start or maintain neutral consumer arbitration forums are unable to do so because they cannot compete with the AAA's anti-competitive pricing and unfair rules while still providing a neutral forum.

240.246.    The AAA retains predominantly retired or currently practicing

corporate defense counsels who are willing to work for a fraction of the cost of their counterpart neutrals hired into ADR providers such as JAMS.

241.247.    JAMS neutrals in North Carolina are comprised of 57% retired judges.

242.248.    In the AAA, however, the lion's share of North Carolina neutrals, 67%, are hired from various facets of corporate defense, and only 9% have experience as judges. Only approximately 12% of North Carolina AAA neutrals have consumer protection experience of any kind and they are rarely selected as neutrals.

243.249.    Upon information and belief, a few experienced retired judges and/or experienced attorneys would adjudicate a complex consumer arbitration for a measly $1,250 or as much as $2,500 when they could get an average of $27,315.51 in JAMS for consumer cases that went to a final hearing on an average case and $5,572.33 for settled cases. See JAMS Spreadsheet.

244.250.    Further, it is unfair to cap consumer arbitrators at $300 per hour, as was started in January of 2024, when other forums allow arbitrators to charge their hourly rate with a normal midpoint rate of approximately $600 an hour.

245.251.    This conduct of hiring predominantly corporate defense lawyers as arbiters violates principles 1, 2, 3, and 4 of the AAA's Consumer Due Process Protocol.

246.252.    The average arbitrator compensation in JAMS for settled consumer cases (cases that were settled prior to the arbitrator's decision) is $5,572.33 and $27,315.51 for consumer cases that went to a final hearing and judgment. See the JAMS spreadsheet.

247.253.    In the AAA, arbitrators, until January 2024, were capped at $1,250 in consumer cases that settle, representing only half of the $2,500 single-

1    day hearing fee.

2        248.254.    In the past year, that cap has changed to $300 an hour for

3    arbitrators in consumer cases only, which is, upon information and belief, far

4    below the market rate and intended to maintain the AAA's artificially low-cost

5    advantage in consumer arbitrations.

6        249.255.    In most cases, both the AAA and JAMS settle.

7        250.256.    Upon information and belief, $1,250 per case was too low to

8    attract talented and skilled arbiters and discourages arbitrators from learning about

9    the case.

10       251.257.    Upon information and belief, $300 per hour is too low to

11   attract talented and skilled arbiters and discourages arbitrators from learning about

12   the case.

13       252.258.    Upon information and belief, the $1,250 the AAA paid

14   consumer arbiters until January of 2024 discouraged arbitrators from reading

15   pleadings, doing research, learning the law surrounding the case, or otherwise

16   doing their job.

17       253.259.    Upon information and belief, the $300 per hour the AAA pays

18   to consumer arbiters after January of 2024 continues to discourage arbitrators

19   from reading pleadings, doing research, learning the law surrounding the case, or

20   otherwise doing their job.

21       254.260.    This conduct of underpaying arbiters is explicitly warned

22   against in Principle 4 of AAA's Consumer Arbitration Due Process Protocol.

23       255.261.    Further, the $1,250 in compensation that the AAA caped

24   arbitrators at, during most of the class period, for settled consumer cases is vastly

25   below the norm for consumer arbitrations in other forums and in other types of

26   arbitrations handled by the AAA.

27       256.262.    Upon    information    and    belief,    the    $300    an    hour    in

28

compensation that the AAA caps arbitrators at during the past year is vastly below the norm for consumer arbitrations in other forums and in other types of arbitrations handled by the AAA.

257.263.    The Defendant defines the product of consumer arbitration in its AAA Consumer Due Process Protocol and establishes what the basic "minimum" due process standards of the consumer arbitration product. However, the AAA flagrantly violates these standards in order to produce an unfair forum that is far from neutral and undermines the competition that is trying to provide a neutral arbitration forum.

258.264.    As a result of the Defendant's anticompetitive actions, consumers are harmed in that their choices of available forums are limited, the choice of rules are limited, and they are stuck with choosing a forum where they will typically lose their arbitration, with no say in even what arbitrator is selected in their arbitration.

259.265.    Upon information and belief, it is difficult, if not impossible, for consumers to find attorneys who will represent them in AAA arbitrations because it is nearly impossible to win and not financially viable to take arbitrations, even with robust consumer acts in WV and NC and attorney fee shifters.

260.266.    Plaintiffs and other similarly situated consumers have suffered significant financial loss as a result of the Defendant's anticompetitive conduct in the format of lost arbitrations, lower awards, difficulty to impossibility in finding counsel to represent them, and inability to protect themselves adequately and vindicate their rights.

261.267.    The Defendant's conduct in limiting arbitrator compensation and providing for restrictive rules for consumer arbitrations is not an act typical or ordinary in the provision of neutral arbitration services.

# PLAINTIFFS

262.268.    In this action, each Plaintiff is filing in their capacity as someone harmed by the Defendants' anticompetitive conduct only.

263.269.    Each Plaintiff would have chosen another forum other than the AAA if they could have but were stuck with the AAA because of the AAA's anticompetitive conduct.

264.270.    The Plaintiffs below does not allege any damages as a result of the AAA's handling of their individual cases, egregious and strange as it may have been in some cases. Plaintiffs is are only alleging damages related to Plaintiff's lack of choice in the marketplace and that they would have chosen another forum, literally any other forum, if they had the option.

## A.    Stephanie Stephens

265.271.    Stephanie Stephens is subject to a forced arbitration agreement with the sole selection of the AAA.

266.272.    Stephanie Stephens's 2016 agreement with CreditWorks, an Experian affiliate, elects AAA as the only forum for dispute resolution, which is common in the consumer credit industry due to the AAA monopoly on dispute resolution for consumer credit and consumer reporting.

267.273.    Plaintiff, as a direct result of Defendant's anticompetitive conduct, was left with no forum option other than AAA.

268.274.    Plaintiff would have chosen any other forum had Plaintiff had the option but was forced to use the AAA because of its monopoly.

269.275.    Stephanie Stephens is not pursuing damages for actions by the AAA in its capacity as an arbitral forum handling an arbitration, only in its capacity as an entity maintaining an illegal monopoly and thereby harming Stephanie Stephens.

276.    Plaintiff was injured by the deprivation of a non-monopolistic forum

for the resolution of her dispute with Experian.

**B.      William Hilton**

277.   Mr. Hilton has consumer cases for harassing phone calls while he was working on debt restructuring under the guidance and assistance of attorneys against First Electronic Bank and The Bank of Missouri.

278.   Both First Electronic Bank and The Bank of Missouri use the same counsel.

279.   The Defendants suggested early settlement but also expressed their intent to file a motion to compel arbitration.

280.   Mr. Hilton's card agreements with both banks elect AAA as the only forum for dispute resolution, which is common in the credit card industry due to the AAA monopoly on dispute resolution for consumer credit cards.

281.   Threats to compel a case to the AAA are code in the legal field to settle cheaply or risk having your case taken to a kangaroo court, where you will get nothing.

282.   The plaintiff's counsel for Mr. Hilton requested Defense Counsel for the Bank of Missouri to use JAMS, but the defense counsel informed the Plaintiff's counsel that they would not because of the cost associated with JAMS.

283.   Plaintiff, as a direct result of Defendant's anticompetitive conduct, was left with no forum option other than AAA.

284.   Mr. Hilton is not pursuing damages for actions by the AAA in its capacity as an arbitral forum handling an arbitration, only in its capacity as an entity maintaining an illegal monopoly and thereby harming Mr. Hilton.

**C.      Joelle Nole**

285.   Ms. Nole had her credit card stolen during a vacation to Hawaii, and the thieves ran up a significant bill.

286.   The bank declined to take action on the matter and suggested that

Ms. Nole had consented to the fraudulent activity, despite a police report containing video evidence of a thief withdrawing money from an ATM in Kauai after she had left the state.

287.    When Ms. Nole looked at her card agreement, the AAA was the only forum available to her to litigate her claims.

288.    The plaintiff would have chosen any other forum had it been available to her, but because of the Defendant's anticompetitive practices, it was the only forum she could file in, so she did.

**D.    Eugénie Balogun**

289.    Ms. Balogun's attorney in North Carolina sent a letter, certified return receipt requested, on her behalf to several creditors letting them know of her representation by counsel as required by North Carolina Law.

290.    Despite receiving this letter, Citibank continued to contact her.  In response to her lawsuit, the Defendant requested the Plaintiff consent to a motion to compel arbitration at the AAA.

291.    The AAA is the only dispute resolution forum in Citibank's credit cards.

292.    As before, a request to compel the case to the AAA is code in the business for "settle cheap."

~~270.~~293.    Ms. Balogun would have used any other forum had it been available, but the defendant's anti-competitive conduct forced her to devalue her case in settlement negotiations, leaving her with a forum choice where she had little hope of success.

## CLASS ACTION ALLEGATIONS

**A.    Sherman/Clayton National Class**

~~271.~~294.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this claim on behalf of all United States residents with a contract

providing the AAA as the only available forum for legal relief for claims.

272.295.    Plaintiff seeks to bring the claims below as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of ~~herself~~ themselves and all others similarly situated.

273.296.    Plaintiff reserves the right to re-define a Sub-Class if necessary [collectively "the Classes"] prior to class certification.

274.297.    Numerosity: The number of persons who are members of the Class, as described above, is so numerous that joinder of all members in one action is impracticable.

275.298.    Predominance: Questions of law and fact that are common to the entire Class predominate over individual questions because the actions of Defendant complained of herein were generally applicable to the entire Class. These legal and factual questions include, but are not limited to:

A.    Whether the Defendant AAA was illegally keeping the prices of its consumer arbitration services so low that they were anticompetitive and designed to create and maintain a monopoly in the area of consumer arbitration; and

B.    Whether the Defendant AAA was illegally creating a limited forum in which consumers were at a disadvantage in the selection of arbitrators, discovery, and the receipt of a fair hearing in a way that was anticompetitive in the market and designed to create and/or maintain a monopoly.

276.299.    Commonality: All questions, actions, and inactions by Defendant at issue are similarly common. Such as making a determination of Defendant's anti-competitive conduct was unfair and deceptive and in violation of state and federal statutes. The issues will be readily determined by reviewing Defendant's records.

277.300.    Numerosity: Plaintiff alleges upon information and belief, that the number of class members is so numerous that joinder of all of them is impractical. Plaintiff's beliefs are based on the fact that: (1) AAA has been involved in over a hundred thousand arbitrations, (2) AAA only forum selection clauses are found in a majority of consumer contracts in the United States including all five of the top five cell phone providers by subscription numbers; (3) within four years prior to the filing of complaint through the date of class certification.

278.301.    The members of the proposed Class will be easily ascertained from the records of the Defendant when discovery commences herein.

279.302.    The Class Representative's claims raise questions of law and fact that are common to claims of each member of the class. Specifically, the central issue raised by this action is whether Defendants violated state and federal law by engaging in monopolistic behavior that created an anti-competitive market for consumer arbitrations.

280.303.    The claims of the Class Representative are not only typical of the claims of each member of the class; they are identical because each consumer was subjected to the same illegal conduct by the Defendant in creating, enforcing, and subjecting consumers to anti-competitive arbitration terms. Specifically, the central issue raised by this action is whether Defendants violated 15 U.S.C.S. § 2 et seq. in creating and maintain an illegal monopoly in the area of consumer arbitration. All purported members of the Classes make the same allegations.

281.304.    The common issues involved in this lawsuit predominate over any separate issues that may exist with the individual Plaintiff.

282.305.    The Class Representatives are United States residents who will fairly and adequately protect and represent the interests of each member of the Classes. Additionally, the Class Representative is fully cognizant of her

responsibilities as Class Representative, and has retained experienced counsel fully capable of, and intend upon, vigorously pursuing this action.

283.306.    The question of law or fact common to Class Representatives' claims and the claims of each member of the Class predominate over any question of law or fact affecting only individual members of the Class. Additionally, the amount in controversy for each Class member's claims would make individual lawsuits economically unfeasible, if not impossible. Class Representation is, therefore, clearly superior to other available methods for the fair and efficient adjudication of this controversy.

**B.    Arizona Anti-Monopoly Subclasses**

284.307.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this claim on behalf of Arizona residents who have a contract that provides for the AAA as the only available forum for legal relief for claims.

285.308.    Plaintiff seeks to bring the claims below as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herselfthemselves and all others similarly situated.

286.309.    Plaintiff reserves the right to re-define a Sub-Class if necessary [collectively "the Classes"] prior to class certification.

287.310.    Numerosity: The number of persons who are members of the Class, as described above, is so numerous that joinder of all members in one action is impracticable.

288.311.    Predominance: Questions of law and fact that are common to the entire Class predominate over individual questions because the actions of Defendant complained of herein were generally applicable to the entire Class. These legal and factual questions include, but are not limited to:

      A.    Whether the Defendant AAA was illegally keeping the prices of its consumer arbitration services so low that they were

anticompetitive and designed to create and maintain a monopoly in the area of consumer arbitration; and

B.    Whether the Defendant AAA was illegally creating a limited forum in which consumers were at a disadvantage in the selection of arbitrators, discovery, and the receipt of a fair hearing in a way that was anticompetitive in the market and designed to create and/or maintain a monopoly.

289.312.    Commonality: All questions, actions, and inactions by Defendant at issue are similarly common. Such as making a determination of Defendant's anti-competitive conduct was unfair and deceptive and in violation of state and federal statutes. The issues will be readily determined by reviewing Defendant's records.

290.313.    Numerosity: Plaintiff alleges, upon information and belief, that the number of class members is so numerous that joinder of all of them is impractical. Plaintiff's beliefs are based on the fact that: (1) AAA has been involved in over a hundred thousand arbitrations, (2) AAA only forum selection clauses are found in a majority of consumer contracts in the United States including all five of the top five cell phone providers by subscription numbers; (3) upon information and belief, the applicable Class period spans many years and including the previous four (4) years from the date of this complaint.

291.314.    The members of the proposed Class will be easily ascertained from the records of the defendant when discovery commences herein.

292.315.    The Class Representative's claims raise questions of law and fact that are common to claims of each member of the class. Specifically, the central issue raised by this action is whether defendants violated state and federal law by engaging in monopolistic behavior that created an anti-competitive market for consumer arbitrations.

293.316.    The claims of the Class Representative are typical of the claims of each member of the class. Specifically, the central issue raised by this action is whether the defendants violated *Arizona Rev. Stat.* § 44-1403 et seq in creating and maintaining an illegal monopoly in the area of consumer arbitration. Further, the Defendants violated Article 14 Section 15 of the Arizona constitution, which bans monopolies in Arizona. All purported members of the Classes make the same allegations.

294.317.    The common issues involved in this lawsuit predominate over any separate issues that may exist with the individual Plaintiff.

295.318.    The Class Representatives are United States residents who will fairly and adequately protect and represent the interests of each member of the Classes. Additionally, the Class Representative is fully cognizant of her responsibilities as Class Representative and has retained experienced counsel fully capable of, and intent upon, vigorously pursuing this action.

319.    The question of law or fact common to Class Representatives' claims and the claims of each member of the Class predominate over any question of law or fact affecting only individual members of the Class. Additionally, the amount in controversy for each Class member's claims would make individual lawsuits economically unfeasible, if not impossible. Class Representation is, therefore, clearly superior to other available methods for the fair and efficient adjudication of this controversy.

**C.    West Virginia Anti-Monopoly & UDAP Subclasses**

320.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this claim on behalf of West Virginia residents who have a contract that provides for the AAA as the only available forum for legal relief for claims.

321.    Plaintiff seeks to bring the claims below as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all others

similarly situated.

322.   Plaintiff reserves the right to re-define a Sub-Class if necessary [collectively "the Classes"] prior to class certification.

323.   Numerosity: The number of persons who are members of the Class, as described above, are so numerous that joinder of all members in one action is impracticable.

324.   Predominance: Questions of law and fact that are common to the entire Class predominate over individual questions because the actions of Defendant complained of herein were generally applicable to the entire Class. These legal and factual questions include, but are not limited to:

      A.   Whether the Defendant AAA was illegally keeping the prices of its consumer arbitration services so low that they were anticompetitive and designed to create and maintain a monopoly in the area of consumer arbitration; and

      B.   Whether the Defendant AAA was illegally creating a limited forum in which consumers were at a disadvantage in the selection of arbitrators, discovery, and the receipt of a fair hearing in a way that was anticompetitive in the market and designed to create and/or maintain a monopoly.

325.   Commonality: All questions, actions, and inactions by Defendant at issue are similarly common. Such as making a determination of Defendant's anti-competitive conduct was unfair and deceptive and in violation of state and federal statutes. The issues will be readily determined from reviewing Defendant's records.

326.   Numerosity: Plaintiff alleges, upon information and belief, that the number of class members is so numerous that joinder of all of them is impractical. Plaintiff's beliefs are based on the fact that: (1) AAA has been involved in over a

hundred thousand arbitrations, (2) AAA only forum selection clauses are found in a majority of consumer contracts in the United States including all five of the top five cell phone providers by subscription numbers; (3) upon information and belief, the applicable Class period spans many years and including the previous four (4) years from the date of this complaint.

327.   The members of the proposed Class will be easily ascertained from the records of the defendant when discovery commences herein.

328.   The Class Representative's claims raise questions of law and fact that are common to claims of each member of the class. Specifically, the central issue raised by this action is whether defendants violated state and federal law by engaging in monopolistic behavior that created an anti-competitive market for consumer arbitrations.

329.   The claims of the Class Representative are typical of the claims of each member of the class. Specifically, the central issue raised by this action is whether defendants violated *W. Va. Code* § 47-18-4 in creating and maintaining an illegal monopoly in the area of consumer arbitration. All purported members of the Classes make the same allegations.

330.   The common issues involved in this lawsuit predominate over any separate issues that may exist with the individual Plaintiff.

331.   The Class Representatives are United States residents who will fairly and adequately protect and represent the interests of each member of the Classes. Additionally, the Class Representative is fully cognizant of her responsibilities as Class Representative, and has retained experienced counsel fully capable of, and intent upon, vigorously pursuing this action.

332.   The question of law or fact common to Class Representatives' claims and the claims of each member of the Class predominate over any question of law or fact affecting only individual members of the Class. Additionally, the amount

in controversy for each Class member's claims would make individual lawsuits economically unfeasible, if not impossible. Class Representation is therefore clearly superior to other available methods for the fair and efficient adjudication of this controversy.

**D.      North Carolina Consumer Protection and Anti-Monopoly Subclasses**

333.   Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this claim on behalf of North Carolina residents who have a contract that provides for the AAA as the only available forum for legal relief for claims.

334.   Plaintiff seeks to bring the claims below as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and all others similarly situated.

335.   Plaintiff reserves the right to re-define a Sub-Class if necessary [collectively "the Classes"] prior to class certification.

336.   Numerosity: The number of persons who are members of the Class, as described above, are so numerous that joinder of all members in one action is impracticable.

337.   Predominance: Questions of law and fact that are common to the entire Class predominate over individual questions because the actions of Defendant complained of herein were generally applicable to the entire Class. These legal and factual questions include, but are not limited to:

       A.      Whether the Defendant AAA was illegally keeping the prices of its consumer arbitration services so low that they were anticompetitive and designed to create and maintain a monopoly in the area of consumer arbitration; and

       B.      Whether the Defendant AAA was illegally creating a limited forum in which consumers were at a disadvantage in the selection of arbitrators, discovery, and the receipt of a fair

hearing in a way that was anticompetitive in the market and designed to create and/or maintain a monopoly.

338.   Commonality: All questions, actions, and inactions by Defendant at issue are similarly common. Such as making a determination of Defendant's anti-competitive conduct was unfair and deceptive and in violation of state and federal statutes. The issues will be readily determined from reviewing Defendant's records.

339.   Numerosity: Plaintiff alleges, upon information and belief, that the number of class members is so numerous that joinder of all of them is impractical. Plaintiff's beliefs are based on the fact that: (1) AAA has been involved in over a hundred thousand arbitrations, (2) AAA only forum selection clauses are found in a majority of consumer contracts in the United States including all five of the top five cell phone providers by subscription numbers; (3) upon information and belief, the applicable Class period spans many years and including the previous four (4) years from the date of this complaint.

340.   The members of the proposed Class will be easily ascertained from the records of the defendant when discovery commences herein.

341.   The Class Representative's claims raise questions of law and fact that are common to claims of each member of the class. Specifically, the central issue raised by this action is whether defendants violated state and federal law by engaging in monopolistic behavior that created an anti-competitive market for consumer arbitrations.

342.   The claims of the Class Representative are typical of the claims of each member of the class. Specifically, the central issue raised by this action is whether Defendants violated *N.C. Code* § 75-2.1 and *N.C. Code* § 75-1.1(a) in creating and maintaining an illegal monopoly in the area of consumer arbitration. All purported members of the Classes make the same allegations.

343.   The common issues involved in this lawsuit predominate over any separate issues that may exist with the individual Plaintiff.

344.   The Class Representatives are United States residents who will fairly and adequately protect and represent the interests of each member of the Classes. Additionally, the Class Representative is fully cognizant of her responsibilities as Class Representative, and has retained experienced counsel fully capable of, and intent upon, vigorously pursuing this action.

345.   The question of law or fact common to Class Representatives' claims and the claims of each member of the Class predominate over any question of law or fact affecting only individual members of the Class. Additionally, the amount in controversy for each Class member's claims would make individual lawsuits economically unfeasible, if not impossible. Class Representation is therefore clearly superior to other available methods for the fair and efficient adjudication of this controversy.

**E.      Washington Consumer Protection and Anti-Monopoly Subclasses**

346.   Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this claim on behalf of Washington residents who have a contract that provides for the AAA as the available forum for legal relief for claims.

347.   Plaintiff seeks to bring the claims below as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated.

348.   Plaintiff reserves the right to redefine a Sub-Class if necessary [collectively "the Classes"] prior to class certification.

349.   Numerosity: The number of persons who are members of the Class, as described above, is so numerous that joinder of all members in one action is impracticable.

350.   Predominance: Questions of law and fact that are common to the

entire Class predominate over individual questions because the actions of the Defendant complained of herein were generally applicable to the entire Class. These legal and factual questions include, but are not limited to:

    A.   Whether the Defendant AAA was illegally keeping the prices of its consumer arbitration services so low that they were anticompetitive and designed to create and maintain a monopoly in the area of consumer arbitration; and

    B.   Whether the Defendant AAA was illegally creating a limited forum in which consumers were at a disadvantage in the selection of arbitrators, discovery, and the receipt of a fair hearing in a way that was anticompetitive in the market and designed to create and/or maintain a monopoly.

351.  Commonality: All questions, actions, and inactions by Defendant at issue are similarly common. Such as making a determination of Defendant's anti-competitive conduct was unfair and deceptive and in violation of state and federal statutes. The issues will be readily determined from reviewing Defendant's records.

352.  Numerosity: Plaintiff alleges, upon information and belief, that the number of class members is so numerous that joinder of all of them is impracticable. Plaintiff's beliefs are based on the fact that: (1) AAA has been involved in over a hundred thousand arbitrations, (2) AAA only forum selection clauses are found in a majority of consumer contracts in the United States including all five of the top five cell phone providers by subscription numbers; (3) upon information and belief, the applicable Class period spans many years and including the previous four (4) years from the date of this complaint.

353.  The members of the proposed Class will be easily ascertained from the records of the defendant when discovery commences herein.

354.   The Class Representative's claims raise questions of law and facts that are common to claims of each member of the class. Specifically, the central issue raised by this action is whether defendants violated state and federal law by engaging in monopolistic behavior that created an anti-competitive market for consumer arbitrations.

355.   The claims of the Class Representative are typical of the claims of each member of the class. Specifically, the central issue raised by this action is whether defendants violated *Washington Code* § 19.86.040 and *Washington Code* § 19.86.020 in creating and maintaining an illegal monopoly in the area of consumer arbitration. All purported members of the Classes make the same allegations.

356.   The common issues involved in this lawsuit predominate over any separate issues that may exist with the individual Plaintiff.

357.   The Class Representatives are United States residents who will fairly and adequately protect and represent the interests of each member of the Classes. Additionally, the Class Representative is fully cognizant of her responsibilities as Class Representative, and has retained experienced counsel fully capable of, and intent upon, vigorously pursuing this action.

296.358.    The question of law or fact common to Class Representatives' claims and the claims of each member of the Class predominate over any question of law or fact affecting only individual members of the Class. Additionally, the amount in controversy for each Class member's claims would make individual lawsuits economically unfeasible, if not impossible. Class Representation is, therefore, clearly superior to other available methods for the fair and efficient adjudication of this controversy.

**CLASS CLAIMS FOR RELIEF**

**COUNT I**

**Violations of the Sherman and Clayton Antitrust Actions National Class**

297.359.    Plaintiffs incorporates herein by reference all preceding paragraphs of the Class Action Complaint as if set forth fully herein verbatim.

298.360.    AAA possesses monopoly power of the consumer arbitration market in the United States of America in violation of 15 U.S.C. § 2 *et seq.*

299.361.    At all times relevant, the AAA has held a monopoly power in the market of consumer arbitrations in the United States.

300.362.    AAA willfully acquired or maintained that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident in violation of 15 U.S.C. § 2 *et seq.*

301.363.    The AAA has willfully maintained its monopoly power through its course of anticompetitive and exclusionary conduct, including AAA's cut-rate pricing practices, which stifle price competition and tend to create an artificial price floor, and AAA's practice of putting a cap on arbitration compensation in consumer cases and using rules that provide consumers with fewer rights to discovery and adjudicate their claims.

302.364.    Although each of these acts is anticompetitive in its own right, these interrelated and independent actions have had a cumulative and synergistic effect that has harmed competition and the competitive process.

303.365.    There is no valid procompetitive justification for AAA's anticompetitive and exclusionary conduct in the consumer arbitration market.

304.366.    AAA acted with the intent to prevent competitors from entering the consumer arbitration market and was not merely the consequence of shutting out competition.

305.367.    The AAA, which currently holds greater than 90% of the

market share within the alternate dispute resolution services (hereinafter "ADR") market space consumer arbitrations, has engaged in anticompetitive behavior to acquire and maintain power over rival ADR providers within the market sector for this service.

306.368.    The Defendant, based on its extensive control of the market, is a monopoly.

307.369.    Indeed, as alleged previously in this complaint, the AAA has engaged in numerous anti-competitive practices to "willfully acquire [and] maintain that power" within the ADR provider market space. *Cavalier Tel., LLC v. Verizon Va., Inc.*, 330 F.3d 176.

308.370.    As a result of the Defendant's conduct, consumers are not provided with a neutral forum with rules and arbitrator compensation that is the norm for neutral private arbitration services both in comparison to AAA's other legal rules, including Employment, Labor, Health, etc., and in comparison, to other arbitral forums like JAMS.

309.371.    As a result of the Defendant's conduct, consumers, such as the Plaintiffs, are not provided with any other ADR form in their consumer agreements, which would allow them to submit their claims in a forum where their rights may be better protected, thus creating a more competitive marketplace for neutral ADR services.

310.372.    As a result of the Defendant's conduct, other businesses that may want to provide neutral ADR services are unable to because of the Defendant's predatory pricing of consumer arbitrations and their its restrictive consumer arbitration rules. Other potential market entrants cannot compete with the AAA and maintain a neutral arbitral forum.

311.373.    Upon best knowledge and belief, the AAA has established itself and maintains its status as the dominant player and market share leader in

the realm of ADR as a service through a pattern of systemic anti-competitive behavior that includes but is not limited to providing a substandard service to its users at a rock-bottom price thereby forcing AAA's competitors out of the ADR market space.

312.374.    The AAA is a monopoly in consumer arbitration and is exercising its control of the market, in the United States, to dominate the market and profiteer off the backs of consumers who have no say in the choice of forum when acquiring services through an adhesion contract.[18]

313.375.    AAA's anticompetitive and exclusionary conduct constitutes unlawful monopoly maintenance, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

314.376.    AAA's anticompetitive and exclusionary conduct in the online marketplace services market has no valid pro-competitive justification.

315.377.    As a result of Defendant's conduct, the Plaintiffs and all others similarly situated have suffered financial harm, lost potential amounts on verdicts by the lack of access to alternative forums with fair rules, wasted time, left without market choices, and endured frustration, annoyance, inconvenience, confusion, and other forms of harm.

## COUNT II
### Violation of the Arizona Antitrust Act
### Arizona Subclass

316.378.    Plaintiff, Stephanie Stephens, incorporates herein by reference all preceding paragraphs of the Class Action Complaint as if set forth fully herein verbatim.

317.379.    *Arizona Code* § 44-1403 states that "The establishment,

---

[18] It is worth noting that none of the cell phone providers, for example, that the Plaintiff looked at provided a contract which did not have arbitration, and none gave consumers any choice in the forum. All selected only the AAA as the ADR forum.

maintenance or use of a monopoly or an attempt to establish a monopoly of trade or commerce, any part of which is within this state, by any person for the purpose of excluding competition or controlling, fixing or maintaining prices is unlawful."

318.380.    Plaintiff incorporates by reference into this Count the Arizona State Constitution Article 14 Section 15, which is included for context on what the prohibition in *Arizona Code* § 44-1403 means. Specifically, it states, "Monopolies and trusts shall never be allowed in this state and no incorporated company, co-partnership or association of persons in this state shall directly or indirectly combine or make any contract, with any incorporated company, foreign or domestic, through their stockholders or the trustees or assigns of such stockholders or with any co-partnership or association of persons, or, in any manner whatever, to fix the prices, limit the production, or regulate the transportation of any product or commodity. The legislature shall enact laws for the enforcement of this section by adequate penalties, and in the case of incorporated companies, if necessary for that purpose, may, as a penalty declare a forfeiture of their franchises."

319.381.    The AAA operates within the State of Arizona.

320.382.    The AAA has a direct effect on Arizona residents affected by arbitration clauses that arise out of the contracts made within the State of Arizona.

321.383.    The Defendant willfully acquired this position as the market share leader through anticompetitive business practices in various territories throughout the United States, including the State of Arizona.

322.384.    AAA's anticompetitive and exclusionary conduct in the online marketplace services market does not have a valid procompetitive justification.

323.385.    As a result of Defendant's conduct, the Plaintiff and all others similarly situated have suffered financial harm, lost potential amounts on verdicts by the lack of access to alternative forums with fair rules, wasted time, left without

market choices, and endured frustration, annoyance, inconvenience, confusion, and other forms of harm.

## COUNT III
### Violation of the Arizona Constitution
### Arizona Subclass

324.386.    Plaintiff, Stephanie Stephens, incorporates herein by reference all preceding paragraphs of the Class Action Complaint as if set forth fully herein verbatim.

325.387.    Article 14 Section 15 of the Arizona State Constitution titled "Monopolies and Trusts" states "Monopolies and trusts shall never be allowed in this state and no incorporated company, co-partnership or association of persons in this state shall directly or indirectly combine or make any contract, with any incorporated company, foreign or domestic, through their stockholders or the trustees or assigns of such stockholders or with any co-partnership or association of persons, or, in any manner whatever, to fix the prices, limit the production, or regulate the transportation of any product or commodity. The legislature shall enact laws for the enforcement of this section by adequate penalties, and in the case of incorporated companies, if necessary for that purpose, may, as a penalty declare a forfeiture of their franchises."

326.388.    Pursuant to *Arizona Code* § 44-1403 the Arizona legislature has empowered consumers to enforce Article 14 Section 15 of the Arizona State Constitution as it applies to their rights being harmed by monopolies and trusts in Arizona.

327.389.    Defendant violated the Plaintiff and that of all other similarly situated's constitutional rights by operating a monopoly in the State of Arizona in violation of Article 14 Section 15 of the Arizona Constitution.

328.390.    The AAA has a direct effect on Arizona residents affected by

arbitration clauses that arise out of the contracts made within the State of Arizona.

329.391.    The Defendant willfully acquired this position as the market share leader through anticompetitive business practices in various territories throughout the United States, including the State of Arizona.

330.392.    AAA's anticompetitive and exclusionary conduct in the online marketplace services market does not have a valid pro-competitive justification.

393.    As a result of Defendant's conduct, the Plaintiff and all others similarly situated have suffered financial harm, lost potential amounts on verdicts by the lack of access to alternative forums with fair rules, wasted time, left without market choices, and endured frustration, annoyance, inconvenience, confusion, and other forms of harm.

## COUNT IV
### Violation of the West Virginia Antitrust Act
### West Virginia Subclass

394.    Plaintiff, William Hilton, incorporates herein by reference all preceding paragraphs of the Class Action Complaint as if set forth fully herein verbatim.

395.    *W. Va. Code* § 47-18-4 states that "[t]he establishment, maintenance or use of a monopoly or an attempt to establish a monopoly of trade or commerce, any part of which is within this State, by any persons for the purpose of excluding competition or controlling, fixing or maintaining prices is unlawful."

396.    The AAA operates within the State of West Virginia.

397.    The AAA has a direct effect upon West Virginia residents affected by arbitration clauses that arise out of the contracts made within the State of West Virginia.

398.    The Defendant willfully acquired this position as the market share leader through anticompetitive business practices in various territories throughout

the United States, including the state of West Virginia.

399.  AAA's anticompetitive and exclusionary conduct in the online marketplace services market does not have a valid pro-competitive justification and unfairly limited the Plaintiff's options to a forum where he would not find justice.

400.  As a result of Defendant's conduct, the Plaintiffs have been harmed financially, lost potential amounts on verdicts, wasted time, left without market choices, been frustrated, annoyed, inconvenienced, confused, and otherwise harmed.

## COUNT V
### Violation of the West Virginia Unfair and Deceptive Acts and Practices Act
### West Virginia Subclass

401.  Plaintiff, William Hilton, incorporates herein by reference all preceding paragraphs of the Class Action Complaint as if set forth fully herein verbatim.

402.  *W. Va. Code* § 46a-6-104 states that "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

403.  The AAA operates within the State of West Virginia.

404.  The AAA has a direct effect upon West Virginia residents affected by arbitration clauses that arise out of the contracts made within the State of West Virginia.

405.  The Defendant, willfully acquired this position as the market share leader through anticompetitive business practices in various territories throughout the United States, including the state of West Virginia.

406.  All West Virginia resident Plaintiffs and putative class members are persons and for purposes of protection under *W. Va. Code* § 46a-6-104.

407. Defendant's use of restrictive rules in consumer arbitration arbitrations, arbitrator compensation way below market rates, lack of arbitrator strikes, and the employment of predominantly corporate defense counsel as arbitrators is an unfair method of competition and unfair business practice pursuant to *W. Va. Code* § 46a-6-104.

408. As a result of the defendant's actions in a second-tier system that limits Plaintiffs' rights and choices in the market to an unfair forum where they have a 88% chance of losing their arbitration.

409. AAA's anticompetitive and exclusionary conduct in the online marketplace services market does not have a valid pro-competitive justification.

410. Further, Plaintiffs have suffered out-of-pocket damages in the form of lost opportunities in defending their rights as a result of the Defendant's anticompetitive behavior.

411. Plaintiff was forced to make a lower settlement demand and accept lower settlement amounts because his only other option was to seek justice in the AAA where he had only a 11% chance of winning at trial, may not get a trial based on the new rules, and had a higher chance of an award being entered against him than him receiving and award.

412. AAA's anticompetitive and exclusionary conduct in the online marketplace services market does not have a valid pro-competitive justification and unfairly limited the Plaintiff's options to a forum where he would not find justice.

413. AAA's anticompetitive and exclusionary conduct in the online marketplace services market does not have a valid pro-competitive justification.

414. As a result of Defendant's conduct, the Plaintiffs have been harmed financially, lost potential amounts on verdicts, wasted time, left without market choices, been frustrated, annoyed, inconvenienced, confused, and otherwise

harmed.

## COUNT VI
### Violation of the Washington Antitrust Act
### Washington Subclass

415.  Plaintiff, Joelle Nole, incorporates herein by reference all preceding paragraphs of the Class Action Complaint as if set forth fully herein verbatim.

416.  *Washington Code* § 19.86.040 states, "It shall be unlawful for any person to monopolize, or attempt to monopolize or combine or conspire with any other person or persons to monopolize any part of trade or commerce."

417.  The AAA operates within the State of Washington.

418.  The AAA directly affects Washington residents affected by arbitration clauses that arise out of contracts made within the State of Washington.

419.  The Defendant willfully acquired this position as the market share leader through anticompetitive business practices in various territories throughout the United States, including the state of Washington.

420.  As recently as 2021 and 2024, the Washington State legislature made the following findings regarding its antitrust/monopoly laws:

**Findings—2024 c 256**: "The legislature finds that:
(1) Strong penalties for antitrust violations are critical to protecting consumers;
(2) Strong penalties for antitrust violations ensure accountability, deter violations, and provide a level playing field and a fair marketplace for businesses;
(3) As of June 6, 2024, Washington does not provide strong enough penalties to adequately deter unlawful anticompetitive business practices;
(4) Washington's penalty for antitrust violations has also not kept pace with inflation;
(5) Washington's civil penalties for antitrust violations are much lower than the harm antitrust violations may cause;
(6) Washington's weak penalties place Washington consumers and businesses at greater risk; and
(7) Washingtonians deserve strong antitrust penalties to ensure entities that

unlawfully engage in anticompetitive behavior are held accountable." [ 2024 c 256 s 1.]

**Short title—2024 c 256**: "This act shall be known and cited as the antitrust penalties improvement act." [ 2024 c 256 s 3.]

**Findings—2021 c 228**: "The legislature finds that:
(1) Strong consumer protection and antitrust penalties are critical to protecting consumers and ensuring a fair marketplace;
(2) Strong penalties ensure accountability, deter violations, and ensure a level playing field for businesses;
(3) Washington currently does not provide strong penalties for violations of the state's consumer protection act, which prohibits unfair or deceptive acts or practices and unfair methods of competition;
(4) Washington's penalty for unfair or deceptive acts or practices has not kept pace with inflation, and has not increased since 1970;
(5) Washington's penalty for unfair methods of competition has also not kept pace with inflation, and has not increased since 1983;
(6) Consequently, Washington has one of the lowest consumer protection penalties in the United States;
(7) Twenty-four state legislatures representing more than 200 million Americans have passed enhanced penalties for violations that target or impact certain vulnerable populations, but Washington does not have an enhanced penalty;
(8) Many Washingtonians are hurting financially due to the impacts of the global pandemic;
(9) Washington's weak penalties place Washington consumers at greater risk; and
(10) Washingtonians deserve strong consumer protections to ensure entities that illegally, unfairly, and deceptively go after their hard-earned dollars are held accountable." [ 2021 c 228 s 1.]

RCW 19.86.140, Washington State Legislature, available at https://app.leg.wa.gov/RCW/default.aspx?cite=19.86.140 (accessed Aug. 29, 2024) (emphasis in original).

421. Washington State legislature encourages the Court to look to Federal Court decisions and final orders of the Federal Trade Commission in dealing with

matters that involve monopolies and restraints of trade.  See RCW § 19.86.920.

422. AAA's anticompetitive and exclusionary conduct in the online marketplace services market does not have a valid pro-competitive justification.

423. As a result of Defendant's conduct, the Plaintiffs have been harmed financially, lost potential amounts on verdicts, wasted time, left without market choices, been frustrated, annoyed, inconvenienced, confused, and otherwise harmed.

**COUNT VII**
**Violation of Washington's Unfair and Deceptive Acts and Practices Law**
**Washington Subclass**

424. Plaintiff, Joelle Nole, incorporates herein by reference all preceding paragraphs of the Class Action Complaint as if set forth fully herein verbatim.

425. *Washington Code* § 19.86.020 states that "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

426. All Washington resident Plaintiffs and putative class members are persons and for purposes of protection under Washington § 19.86.020.

427. Defendant's use of restrictive rules in consumer arbitration, arbitrator compensation way below market rates, lack of arbitrator strikes, and the employment of predominantly corporate defense counsel as arbitrators is an unfair method of competition and unfair business practice pursuant to Washington § 19.86.020.

428. As a result of the defendant's actions in a second-tier system that limits Plaintiffs' rights and choices in the market to an unfair forum where they have a 58% chance of losing their arbitration.

429. Further, Plaintiffs have suffered out-of-pocket damages in the form of lost opportunities to defend their rights as a result of the Defendant's

anticompetitive behavior.

430.   AAA's anticompetitive and exclusionary conduct in the online marketplace services market does not have a valid pro-competitive justification.

431.   As a result of Defendant's conduct, Plaintiffs have been financially harmed, annoyed, inconvenienced, left with no options in the market, and otherwise harmed.

**COUNT IV**
**Violation of North Carolina's Unfair and Deceptive Acts and Practices Law**
**North Carolina Subclass**

432.   Plaintiff, Eugénie Balogun, incorporates herein by reference all preceding paragraphs of the Class Action Complaint as if set forth fully herein verbatim.

433.   N.C. Code § 75-1.1(a) states that "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."

434.   All North Carolina resident Plaintiffs and putative class members are persons, and for purposes of protection under N.C. Code § 75-1.1.

435.   Defendant's use of restrictive rules in consumer arbitration, arbitrator compensation way below market rates, lack of arbitrator strikes, and the employment of predominantly corporate defense counsel as arbitrators is an unfair method of competition and unfair business practice pursuant to N.C. Code § 75-1.1.

436.   As a result of the defendant's actions in a second-tier system that limits Plaintiffs' rights and choices in the market to an unfair forum where they have a 76% chance of losing their arbitration.

437.   AAA's anticompetitive and exclusionary conduct in the online marketplace services market does not have a valid pro-competitive justification.

438.   Further, Plaintiffs have suffered out-of-pocket damages in the form of lost opportunities in defending their rights as a result of the Defendant's anticompetitive behavior.

~~331.~~439.   As a result of Defendant's conduct, Plaintiffs have been financially harmed, annoyed, inconvenienced, left with no options in the market, and otherwise harmed.

## DEMAND FOR RELIEF

The Plaintiffs demands from the Defendant:

a)      Certification of the classes and subclasses alleged herein;

b)      Declaration that Defendant has violated the federal antitrust laws, including the Sherman Act and the Clayton Act;

c)      Declaration that Defendant has violated the Arizona antitrust laws and the Arizona Constitution;

d)      Declaration that Defendant has violated the West Virginia antitrust and unfair and deceptive trade practices laws;

e)      Declaration that Defendant has violated the North Carolina unfair and deceptive trade practices laws;

f)      Declaration that Defendant has violated the Washington antitrust and unfair and deceptive trade practices laws;

~~a)~~g)   Injunctive relief pursuant to 15 U.S.C. § 26;

~~b)~~h)   On behalf of ~~herself~~ themselves and all members of the proposed Class herein, demands judgment in an amount sufficient to fully compensate ~~her~~ them and all members of the proposed Class for all damages they have suffered as a result of the Defendants violations of statute, violations of public policy, or other wrongful and/or illegal conduct;

~~c)~~i)   Actual damages for the violations of the Clayton Antitrust Act, as

1    authorized by 15 U.S.C. 15, plus interest pursuant to the same for all

2    such violations that occurred up to the date and time of the filing of

3    this complaint;

4    d)j)    Treble damages for the violations of the Clayton Antitrust Act, as

5    authorized by 15 U.S.C. 15 plus interest pursuant to the same;

6    e)k)    Plaintiff's cost of litigation including reasonable attorney's fees for

7    litigation of this violation of the Clayton Antitrust Act, as authorized

8    by 15 U.S.C. 15;

9    f)l)    Actual damages for the violations of the Arizona Uniform State

10    Antitrust Act pursuant to *Arizona Code* § 44-1408;

11    g)m)    Treble damages for the violations of the Arizona Uniform State

12    Antitrust Act pursuant to *Arizona Code* § 44-1408;

13    n)    Injunctive relief in the form of forfeit of the franchise pursuant to

14    *Arizona Constitution* § Article 14 Section 15;

15    o)    Actual damages for the violations of the West Virginia Antitrust Act

16    pursuant to West Virginia Code §47-18-9;

17    p)    Treble damages for the violations of the West Virginia Antitrust Act

18    pursuant to West Virginia Code §47-18-9;

19    q)    Actual damages for the violations of the West Virginia Antitrust Act

20    pursuant to West Virginia Code §47-18-9;

21    r)    Treble damages pursuant to N.C. Code § 75-16;

22    s)    Attorneys' fees and costs pursuant to N.C. Code § 75-16.1;

23    t)    A civil penalty of $7,500 for each violation of Washington Code §

24    RCW 19.86.020 pursuant to RCW 19.86.140.

25    u)    Three times the unlawful gains and/or loss avoided as a result of each

26    violation of Washington Code § RCW 19.86.040 pursuant to RCW

27    19.86.140.

28

v)     Injunctive relief pursuant to Washington Code § RCW 19.86.090.

w)     Plaintiffs' cost of litigation, including reasonable attorney's fees for litigation of this violation of the West Virginia Antitrust Act pursuant to West Virginia Code §47-18-9;

x)     Plaintiffs' cost of litigation, including attorney fees, court costs, and fees, pursuant to West Virginia Code §46A-5-104;

h)y)     Statutory damages for each violation in the amount of $200 or actuals, whichever is greater, pursuant to West Virginia Code §46A-6-106;

i)z)     If a class and/or subclass are not certified, Plaintiffs seeks issue certification for each class and cause of action; and

j)aa)     Such other relief as the Court shall deem just and proper under the attendant circumstances.

**PLAINTIFFS DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

RESPECTFULLY SUBMITTED,

Dated: June 18, 2025,

*/s/ Susan Mary Rotkis*
Susan Mary Rotkis, AZ Bar No. 032866
**CONSUMER JUSTICE LAW FIRM**
2290 East Speedway Boulevard
Tucson, AZ 85719
T: (602) 807-1504
E: srotkis@consumerjustice.com

David A. Chami, AZ Bar No. 027585
**CONSUMER JUSTICE LAW FIRM**
8095 North 85th Way
Scottsdale, AZ 85258
T: (480) 626-2359
E: dchami@consumerjustice.com

Benjamin Sheridan, WV Bar No. 11296
Jed Nolan, WV Bar No. 11296
*admitted pro hac vice*
**KLEIN & SHERIDAN, LC**
3566 Teays Valley Road
Hurricane, WV 25526
T: (304) 562-7111
E: ben@kleinsheridan.com
E: jed@kleinsheridan.com

*Attorneys for Plaintiff Stephanie Stephens
& the Putative Class*